ENGINEERING SOCIETY OF DETROIT *v.* CITY OF DETROIT.

1. TAXATION—EXEMPTIONS—BURDEN OF PROOF—SCIENTIFIC OR EDU-CATIONAL INSTITUTIONS.

The party claiming exemption from taxation under the general property tax law as a scientific or educational institution has the burden of establishing the fact that it is such an institution (1 Comp. Laws 1929, § 3395, as amended by Act No. 125, Pub. Acts 1941; § 3397, as amended by Act No. 232, Pub. Acts 1939).

2. SAME—EXEMPTIONS—REALTY—LIBRARIES, BENEVOLENT, CHARI-TABLE, EDUCATIONAL OR SCIENTIFIC INSTITUTIONS.

Under exemption provision of the general property tax law pertaining to real estate to obtain an exemption, a library, benevolent, charitable, educational, or scientific institution must have been incorporated under the laws of this State and own and occupy the property solely for the purposes for which it was incorporated (1 Comp. Laws 1929, § 3395, as amended by Act No. 125, Pub. Acts 1941).

3. APPEAL AND ERROR—DE NOVO REVIEW—OWNERSHIP OF PROPERTY CLAIMED TO BE TAX EXEMPT.

The question of ownership of realty claimed to be tax exempt under the general property tax law is reviewable by Supreme Court in suit to cancel a tax assessed against the property as chancery cases are heard *de novo* (1 Comp. Laws 1929, § 3395, as amended by Act No. 125, Pub. Acts 1941).

4. TAXATION—EXEMPTION—EQUITABLE TITLE—OWNERSHIP—OCCU-PANCY.

Where naked legal title to real and personal property was in a nonprofit trustee corporation organized to manage and invest funds of an engineering society with some 3,700 members and affiliate member organizations which occupies the building and uses the property for holding meetings, sponsors courses in technical subjects and conducts a vocational guidance engineering program for senior high school students and permits

use of facilities by various public enterprises, the engineering society was not only the occupant but owner of the equitable title for taxation purposes (1 Comp. Laws 1929, § 3391).

5. Same—Realty—Assessment—Liability of Owner or Occupant.
Real property may be assessed both to the owner and the occupant and either one is liable for the taxes (1 Comp. Laws 1929, § 3391).

6. Same—Exemptions—Scientific or Educational Institution—Recreational Uses.
In suit by a nonprofit corporation assumed to have been incorporated solely for scientific or educational purposes to cancel property tax assessed against building and personalty therein used by it, where it appears that duties of most of its employees are not in line with occupancy for mentioned purposes but correspond more closely with those of a staff of employees operating and maintaining a recreational club for the membership, the corporation has failed to establish that the use and occupancy is so essentially for the mentioned purposes as to entitle it to an exemption from taxation (1 Comp. Laws 1929, § 3395, as amended by Act No. 125, Pub. Acts 1941; § 3397, as amended by Act No. 232, Pub. Acts 1939).

7. Same—Educational or Scientific Institution—Public or Philanthropic Use—Exemption.
Use or occupancy of building for public or philanthropic purposes is not essentially use or occupancy for scientific or educational purposes and while permission to use it for such purposes is commendable, it does not constitute a ground for exempting the owner or occupant from payment of property tax on the building and personalty therein under statute exempting property owned and occupied by an educational or scientific institution incorporated under the laws of this State but not occupied by exemption claimant solely for purposes for which it was incorporated (1 Comp. Laws 1929, § 3395, as amended by Act No. 125, Pub. Acts 1941; § 3397, as amended by Act No. 232, Pub. Acts 1939).

8. Costs—Public Question—Construction of Statutes—Tax Exemptions.
No costs are allowed in suit to cancel property tax assessed against real and personal property of an engineering society where construction of exemption provisions of general property tax law is involved, the issues being of a public nature (1 Comp. Laws 1929, § 3395, as amended by Act No. 125, Pub. Acts 1941; § 3397, as amended by Act No. 232, Pub. Acts 1939).

Appeal from Wayne; Gilbert (Parm C.), J., presiding. Submitted January 13, 1944. (Docket No. 63, Calendar No. 42,616.) Decided April 4, 1944.

Bill by Engineering Society of Detroit and the Rackham Engineering Foundation, Michigan corporations, against City of Detroit and others to cancel an assessment of property for taxes. Decree for defendants. Plaintiffs appeal. Affirmed.

*Oscar C. Hull (Hull, Brown & Fischer, of counsel),* for plaintiffs.

*Paul E. Krause,* Corporation Counsel, *John G. Dunn,* Assistant Corporation Counsel, and *George C. Coffey,* for defendants.

BOYLES, J. This is a chancery suit brought by plaintiffs to cancel a property tax assessed by the city of Detroit for 1942 on their real and personal property. Plaintiffs claim that their property is exempt from taxation because they are educational or scientific institutions. The court held that the property was not exempt from taxation and plaintiffs appeal from a decree dismissing their bill of complaint. There is no dispute as to the basic facts. The parties are at issue only as to permissible inferences to be drawn from the established facts, and the rules of law which should apply.

The applicable provisions of the tax exemption statutes relied upon by plaintiffs are as follows:

"The following real property shall be exempt from taxation:    *    *    *

"Fourth, Such real estate as shall be owned and occupied by library, benevolent, charitable, educational or scientific institutions    *    *    *    incorporated under the laws of this State with the buildings

and other property thereon while occupied by them solely for the purposes for which they were incorporated.'' 1 Comp. Laws 1929, § 3395, as amended by Act No. 125, Pub. Acts 1941 (See Comp. Laws Supp. 1943, § 3395, Stat. Ann. 1943 Cum. Supp. § 7.7). (Subsequent amendments in 1942 and 1943 do not bear on the issues here involved.)

''The following personal property shall be exempt from taxation, to-wit:

''First, The personal property of benevolent, charitable, educational and scientific institutions, incorporated under the laws of this State.'' 1 Comp. Laws 1929, § 3397, as amended by Act No. 232, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 3397, Stat. Ann. 1943 Cum. Supp. § 7.9).

The building involved in this controversy was dedicated in 1942; the board of assessors and the common council of Detroit denied plaintiffs' request for exemption from taxation and placed the property on the assessment roll. Plaintiffs now seek reversal of the decree entered in the circuit court, on the same grounds urged before the city authorities or in the lower court, namely, that the Rackham Engineering Foundation and the Engineering Society of Detroit are scientific institutions or educational institutions within the meaning of the tax-exemption statutes. The burden of establishing the fact rests on plaintiffs and appellants.

In 1933 Horace H. Rackham, a prominent citizen of Detroit, created by will what is known as the Rackham Fund, to be administered for benevolent, charitable, educational, scientific, religious and public purposes. At that time there was in Detroit a Detroit Engineering Society and also local sections of certain national organizations representing various branches of engineering and science. The Detroit Engineering Society had been in existence

about 40 years, with a membership ranging from 135 to 900 members. It owned a building on Alexandrine avenue, Detroit, for use of its membership and the dozen or more affiliated societies then associated with it. The building had a kitchen and dining room and meetings were held there by its members and those of the associated technical societies. The property was assessed for taxes.

For many years the Society had been hampered by lack of funds and in 1934 or 1935 the Detroit Engineering Society sought aid from the Rackham Fund. The trustees of the Rackham Fund were not satisfied with the status of the old Detroit Engineering Society, so the Engineering Society of Detroit, plaintiff and appellant herein, a nonprofit corporation, was organized in 1936. In June, 1936, five individuals became incorporated as a nonprofit trustee corporation under the name of the Rackham Engineering Foundation. The main purpose of the Rackham Engineering Foundation was and still is to act as trustee for the Engineering Society of Detroit and to manage and invest the funds which it holds in trust for the benefit of the Society. The Rackham Fund and Mrs. Rackham made donations to the Rackham Engineering Foundation aggregating $1,500,000, and Mrs. Rackham also made a gift to the regents of the University of Michigan and the Foundation of $750,000.

In 1936 the University of Michigan was conducting extension courses in Detroit, which had been hampered by lack of facilities. The Rackham Fund, with Mrs. Rackham, provided additional funds whereby a building was erected on Woodward avenue in Detroit, known as the Horace H. Rackham Educational Memorial Building. The record title to the westerly portion of this building is in the Regents of the University of Michigan. The city of

Detroit did not attempt to assess this portion of the building for taxes and for that reason it is not directly involved in the present controversy. The record title to the easterly portion of the building is in the Rackham Engineering Foundation, as trustee for the benefit of the Engineering Society of Detroit. The title to the personal property therein is also in the Rackham Engineering Foundation. This easterly portion of the building and the personal property therein has been assessed for 1942 city taxes by the city of Detroit, which fact gives rise to the present litigation.

In this easterly portion are facilities used by the Engineering Society of Detroit, including a library, an auditorium, offices, committee rooms, a dining room, kitchen, a cigar stand, bowling alleys, billiard and pool tables. There is also available for the use of the Engineering Society of Detroit a large auditorium and a banquet hall in that portion of the building owned by the University of Michigan. The Engineering Society of Detroit uses and occupies its portion of the building and equipment upon the express condition that if it fails to carry out its purposes or fails to function, or becomes insolvent or is dissolved, its right to the property shall cease and pass to the University of Michigan. The individual and affiliate members of the Engineering Society of Detroit are charged with initiation fees and dues and are subject to suspension for failure to pay the same. It has about 3,700 individual members and 24 affiliate members. Approximately 2,000 of its individual members are not members of the affiliates. These affiliates are mostly local chapters of national organizations and societies, such as American Chemical Society, American Foundrymen's Association, American Institute of Architects, American Institute of Mechanical Engineers, American Institute of

Electrical Engineers, American Society for Metals, American Society of Civil Engineers, American Society of Heating & Ventilating Engineers, American Society of Landscape. Architects, American Society of Mechanical Engineers, American Society of Refrigerating Engineers, American Welding Society, Illuminating Engineers Society, Institute of Aeronautical Sciences, Society of Automotive Engineers.

The Engineering Society of Detroit initiates and carries on programs for its membership, holds regular meetings about once a month, sponsors courses in technical subjects, such as chemistry, and conducts a vocational guidance engineering program for senior high school students. Its facilities are used by public enterprises, such as the Red Cross, U. S. Army, Boy Scouts, bond drives, safety campaigns, civilian defense. In addition, there are activities carried on by the affiliate members, each of which has a meeting about once a month dealing with its particular branch of activity. The largest of these affiliates is the Society of Automotive Engineers which holds general meetings as well as committee meetings. An affiliate known as the War Engineering Board, consisting of 30 outstanding engineers, meets regularly, and other affiliates carry on similar activities. Most of these affiliates had been active for many years in Detroit prior to 1936. The Engineering Society of Detroit has organized an affiliate council consisting of two representatives from each affiliate, the purpose of which is to give unity to the activities of these diverse affiliate organizations.

The scientific equipment of the Engineering Society of Detroit consists of a laboratory table and a library of 400 volumes. The Society does not issue any scientific publications or textbooks, but sometimes an abstract of lectures or speeches is made for

its membership but not for the general public. One of the affiliate organizations, the American Chemical Society, put on refresher chemistry lectures to aid its members. The Engineering Society of Detroit itself assumes no responsibility for the lectures presented by its affiliates, has no independent research faculty nor a prescribed course of scientific education. It owns no special scientific equipment, does not itself conduct any research in scientific matters, and has no control over the programs of the affiliates. The only contribution made by the Society to the affiliates is to furnish the building and facilities for their meetings. It has a managing secretary who supervises accounts, prepares notices, and in general handles its own membership matters. The Society's managing secretary employs two accountants, a receptionist and stenographer, a secretary, a clerk, a librarian, and a part-time employee in the mail room. The Society also employs a building manager who has a staff of about 50 employees. This staff consists of maintenance men, a food steward, cooks, waitresses, pantry girls, vegetable men, general roustabouts, cigar counter cashiers, checkroom girls, pin boys, bowling alley and billiard table caretakers. The building manager and his staff arrange space and restaurant matters for dinners and meetings. The expense of about 12 building maintenance employees is divided equally by the University and the Engineering Society of Detroit. The expense of the rest of the staff is paid by the Society.

The record shows that in a typical busy month, October, 1942, there were 124 meetings of all kinds in the easterly portion of the building which is used and occupied by the Engineering Society of Detroit. The plaintiff Society had seven meetings, consisting of its regular monthly dinner meeting and committee

meetings. Seventy-two of the 124 meetings were held by outside organizations not in any way associated with the Engineering Society of Detroit or any of its affiliates, at 50 of which meetings dinner was served. The remaining 45 meetings were held by the affiliates, at which dinner was usually served. In addition, there were 13 private luncheons and dinners of groups of men associated in a business way with some member of the plaintiff Society. These private luncheons and dinners were arranged by some member of plaintiff Society. The wives of various members held five meetings, at which meals were served. Of the total number of 124 meetings, 17 were held in the large auditorium or banquet hall of the University of Michigan, 12 of which were dinner meetings. The affiliates as well as most outside organizations pay for the use of the facilities, $5 for using each committee room, $30 for the small auditorium, $50 for the large one. In 1942 the Society received $10,359.25 initiation fees and $55,933.66 for annual dues. During the same year it received $15,347.63 from the Rackham Engineering foundation endowment. The total receipts of the Engineering Society of Detroit for the year 1942, outside of initiation fees, including endowment, amounted to $182,576.75. Total disbursements were $179,511.38, showing a net profit of $3,065.37 for 1942. The revenue from food service for the last half of the year 1942 was $50,168.02. The food operation is 100 per cent. the responsibility of the plaintiff Society. Cigars, billiards and parking lot showed a net operating loss, bowling a small profit. The food operation requires the services of 30 to 35 people, on the average. Among the dinners or luncheons served in the building by the Society management during the month of October, 1942, selected by plaintiffs as a typical month, were the following:

(October 5)  "At 1 p.m. that day, in rooms C and D, the wife of a member of the Engineering Society of Detroit had a luncheon group which, according to the space assigned, would indicate between 30 and 40 people."

(October 6)  "In rooms E, F and G, at 6:30 that night, the wife of a member of the Engineering Society of Detroit had a dinner. That indicates a rather large meeting. I would say meals for 60 up."

(October 8)  "Rooms C and D, at 12:15, Col. Alden of the S. A. E., had a luncheon in those rooms.  * * *

"In E, F and G, at 6:30 p.m., the Detroit Dental Society had a dinner, preceding their meeting in the auditorium."

(October 10)  "In rooms C and D, there was a 6 o'clock dinner for the Michigan Physiological Society, followed by a meeting. The banquet hall, at 7:30 p. m., was a dinner for the osteopaths."

(October 12)  "In rooms E, F and G, the Michigan Aeronautical Association had a meeting and dinner."

(October 13)  "Room B, Boy Scouts of America, had a dinner and meeting at 6:30. Rooms C and D was an S. A. E. luncheon. Rooms E, F and G, dinner at 6:30 for A. I. S. E. I am not just sure what that is. The banquet hall was used at 6 o'clock for a dinner for the safety council, preceding their meeting in the auditorium."

(October 14)  "Rooms E, F and G, at 12:30, the Society of Engineers' Wives had a luncheon and meeting. At 6 p.m., in E, F and G, the Child Education Group had a dinner and meeting. In the banquet hall there was an exhibit by the Chrysler Corporation and a luncheon."

(October 16)   "In room B, at 6 p.m., was a dinner by a member of the Engineering Society of Detroit."

(October 17)   "Rooms E, F and G, at 6:30 was the City Housing and Planning Commission. dinner and meeting."

(October 19)   "Room B, 6:30, member of the Engineering Society for dinner."

(October 22)   "Room B, the U. S. Navy, at 8 p.m. Rooms C and D, Torch Club dinner and meeting, at 6:30.   Rooms E, F and G, a dinner for a member of the Engineering Society of Detroit."

(October 24)   "The University of Michigan Auditorium, Campfire Girls met at 1:30.   E. S. D. Auditorium, Red Cross meeting, 10:30.   Rooms C and D, at 7 p.m., dinner by a member of the Engineering Society of Detroit."

(October 26)   "In room B, at 6:30, a dinner by a member of the Engineering Society."

(October 30)   "Room B, dinner and meeting of the Boy Scouts of America.   *   *   *
"Rooms C and D, at 6:30 p.m., a dinner by a member of the Engineering Society."

(October 31)   "The E. S. D. auditorium, Red Cross meeting at 10:30.   Room B, Tau Beta Pi meeting at 5.   Room B, there was that Tau Beta Pi meeting and rooms C and D, dinner for that same group."

An analysis of the real-estate tax-exemption provision of the general tax law (1 Comp. Laws 1929, § 3395, as amended by Act No. 125, Pub. Acts 1941 [See Comp. Laws Supp. 1943, § 3395, Stat. Ann. 1943 Cum. Supp. § 7.7], *supra*), upon which appellants rely, leads to the following conclusions:

(1)   The real estate must be owned and occupied by the exemption claimant;

(2)   The exemption claimant must be a library, benevolent, charitable, educational or scientific institution;

(3)   The claimant must have been incorporated under the laws of this State;

(4)   The exemption exists only when the buildings and other property thereon are occupied by the claimant solely for the purposes for which it was incorporated.

The trial judge held that the property in question was owned and occupied by the Engineering Society of Detroit within the meaning of the tax exemption statute, *supra*. Appellees challenge the correctness of this ruling, and the question is before us because we hear chancery cases *de novo*. The defendant city claims that the property is *not* exempt from taxation because it is not *both* owned and occupied by the Society—that it is *owned* by the Rackham Engineering Foundation, not a scientific or educational institution, and occupied by the Engineering Society of Detroit but not solely for the purposes for which it was incorporated. The city argues that while the easterly portion of the building (the part assessed for taxes) is owned by the Rackham Engineering Foundation, it is not *occupied* by the Foundation; and that while it is *occupied* by the Engineering Society of Detroit, the Society does not own it, wherefore it is not exempt from taxation under the statute. We are not in accord with this position advanced by the city. The Foundation holds the naked title to the property, as trustee for the Engineering Society of Detroit. The equitable title is in the Engineering Society of Detroit for taxation purposes. The Society also is the occupant of the real estate. Real property may be assessed both to the

owner and the occupant, and either one is liable for the taxes. 1 Comp. Laws 1929, § 3391 (Stat. Ann. § 7.3); *Blackwood* v. *Van Vleit,* 30 Mich. 118; *Auditor General* v. *Women's Temperance Association of Manistee,* 119 Mich. 430; *Pioneer Fuel Co.* v. *Molloy,* 131 Mich. 465.

Is the Engineering Society of Detroit either a scientific institution or an educational institution within the meaning of the exemption statutes? The lower court said "No" and denied tax exemption on that ground. We can find the answer only as a conclusion drawn from the facts. No rule of law can settle the question with certainty, because factual circumstances vary with the case. We have reviewed the 400 pages of testimony adduced by plaintiffs to prove that the Society was a scientific or educational institution. A more complete résumé of the testimony than has been given would accomplish nothing more than add to the uncertainty. Admittedly a close question, the reasoning of the trial court in a lengthy opinion reviewing the testimony is convincing that plaintiffs have not sustained the burden of proof to the extent that we can say with a fair degree of certainty the conclusion of the circuit judge was contrary to the great weight of the evidence. See *Colony Town Club* v. *Michigan Unemployment Compensation Commission,* 301 Mich. 107.

We are not in accord with the conclusion of the trial court that the building and other property is occupied by the Engineering Society of Detroit solely for the purposes for which it was incorporated, assuming the fact to be that it was incorporated solely for scientific or educational purposes. Stated in another way, we conclude that under the testimony in the case the building and other property is not occupied by the Engineering Society of Detroit solely for scientific or educational purposes.

It may be conceded that the 24 affiliate societies and organizations are essentially scientific or educational institutions. However, the record does not indicate that they are corporations organized under the laws of the State of Michigan, nor is the use and occupancy of the real and personal property by the Society limited to these affiliates. The property is used and occupied by the Engineering Society of Detroit for a variety of benefits to its 2,000 members who are not members of the affiliated societies or organizations and for purposes which are quite foreign to science and education. It may be conceded that the occasional or incidental use of property for dinners, at which the primary object of the meeting was to listen to an address or a discussion of matters pertaining to science or education, need not prevent the property from being exempt from taxation. The use of the property in question is not thus limited. The duties of most of the employees of the Engineering Society of Detroit are not in line with occupancy of the property for scientific or educational purposes. Their duties correspond more closely with those of a staff of employees operating and maintaining a recreational club for the membership. The building is a convenient meeting place for the use of those who are admitted as members, but plaintiffs have failed to establish that its use and occupancy by the Engineering Society of Detroit is so essentially for scientific or educational purposes as to afford the Society an exemption from taxation.

While the use or occupancy of the building for meetings of Red Cross, U. S. Army, Boy Scouts, bond drives, safety campaigns, civilian defense, et cetera, is unquestionably for public purposes and commendable on that ground, proof of such use does not aid appellants' claim that the building is used or occupied for scientific or educational purposes. Use

of buildings for public or philanthropic purposes is not essentially use or occupancy for scientific or educational purposes. Appellants in their reply brief claim that:

*"The dominant public character of the activities of the society entitle it to exemption.*

"The record shows that while certain activities of the Society are beneficial to engineers and scientists in the practice of their profession, a substantial part of these activities is a benefit to the public on matters of primary public interest, and that engineers and scientists are giving their time and services, and the facilities of the Society in the furtherance of these projects, without stint and without pay. The contributions to the war effort and to civilian defense are of this character. This type of activity which is an important part of the Society's work, makes it unique and entitles it to exemption."

The plain answer to this claim is that the tax exemption statute does not recognize use or occupancy of a building for the public benefit or public purposes as a ground for exemption from taxes. Such use is obviously commendable, but whether it should entitle the owner or occupant of the building to tax exemption is a legislative matter.

The record shows that personal property was assessed separately from the building but no claim is made that a different rule should apply as to personal property. We are not convinced that the conclusion reached by the trial court was contrary to the great weight of the evidence.

The decree is affirmed, but without costs, issues of a public nature being involved.

NORTH, C. J., and STARR, WIEST, BUTZEL, BUSHNELL, SHARPE, and REID, JJ., concurred.