MICHIGAN BAPTIST HOMES & DEVELOPMENT COMPANY v
CITY OF ANN ARBOR

Docket No. 56407. Argued November 6, 1975. Resubmitted December
19, 1975 (Calendar No. 12).—Decided June 3, 1976.

> Plaintiff Michigan Baptist Homes and Development Company
> owns and operates Hillside Terrace, a licensed home for the
> aged in Ann Arbor. The Ann Arbor City Assessor denied the
> home an exemption from ad valorem property taxes as a
> charitable institution in 1971–72. A resident of the home pays a
> life-lease fee and a monthly service charge to the plaintiff based
> upon the size of his apartment, and the facility is intended to
> be self-supporting and self-liquidating in operation. Ability to
> pay the fees is a factor determining whether an applicant will
> be admitted to Hillside Terrace; applicants are also subject to
> health requirements and must demonstrate ability to maintain
> themselves in their apartments. The Ann Arbor Board of
> Review, the State Tax Commission and the Court of Appeals,
> Danhof, P. J., and T. M. Burns and Carland, JJ., affirmed the
> action of the city assessor (Docket No. 17211). Plaintiff appeals.
> *Held:*
>
> 1. Basically, it may be said that charity or benevolence
> benefit the general public without restriction. Hillside Terrace
> was not occupied for charitable or benevolent objectives during
> the years in question. It does not serve the elderly generally
> but provides a retirement environment for those who have
> their health and can afford to pay. The residents have provided
> for themselves by purchasing a life-care contract at cost
> through the plaintiff.
>
> 2. The Legislature has not shown an intent to exempt all
> housing for the elderly from the general property tax by
> allowance of certain limited tax relief for taxpayers over the
> age of 65 who rent or own homes.
>
> 3. The court declines to address the issue of the constitution-

REFERENCES FOR POINTS IN HEADNOTES
[1, 7, 8] 71 Am Jur 2d, State and Local Taxation § 307 *et seq.*
[2–6, 9, 11, 12] 71 Am Jur 2d, State and Local Taxation §§ 362–391.
[10] 71 Am Jur 2d, State and Local Taxation §§ 385, 387.

ality of an exemption for certain low income senior citizen housing qualified for Federal financing under the National Housing Act.

4. Plaintiff has not been denied equal protection of the laws by the granting to another home for the elderly in Ann Arbor of the exemptions plaintiff seeks where the other home is endowed by charitable contributions, the residents do not pay the actual costs of their care, admission depends upon the applicant's inability to live without supervision, and priority is given to applicants who cannot obtain care elsewhere.

Affirmed.

Justice Coleman dissented on the following grounds: For designation of an institution as charitable or benevolent, it should be a nonprofit institution of beneficial interest to society. The charging of fees equal to costs does not necessarily prevent classification of an institution as nonprofit. The controlling consideration is whether the fees charged do not exceed what is required to maintain the institution at a reasonable standard of operation. A charitable designation is not limited to relief of poverty; if the benefit conferred has a sufficiently widespread social value, a charitable purpose exists. Aged people require care and attention apart from financial assistance and the supply of this care is as much a charitable and benevolent purpose as the relief of their financial wants. Hillside Terrace is entitled to an exemption from property taxes under the facts of this case as a charitable undertaking providing for the physical, mental, and emotional needs of the aged.

55 Mich App 725; 223 NW2d 324 (1974) affirmed.

OPINION OF THE COURT

1. TAXATION—REAL PROPERTY TAXES—EXEMPTIONS.

Exemption from taxation effects the unequal removal of the burden generally placed on all landowners to share in the support of local government; since exemption is the antithesis of tax equality, exemption statutes are to be strictly construed in favor of the taxing unit.

2. TAXATION—REAL PROPERTY TAXES—CHARITABLE INSTITUTIONS—EX-EMPTIONS.

To obtain an exemption of real property from taxation, a library, benevolent, charitable, educational, or scientific institution must have been incorporated under the laws of this state and own and occupy the property solely for the purposes for which it was incorporated (MCL 211.7; MSA 7.7).

3. Taxation—Real Property Taxes—Charitable Institutions—Exemptions.

The fact that charges approximating costs are made for services and benefits offered by a landowner claiming to be exempt from real property taxes as a charitable institution does not alone defeat the exemption claim; however, exempt status requires more than a mere showing that services are provided by a nonprofit corporation (MCL 211.7; MSA 7.7).

4. Taxation—Charitable Institutions—Exemptions.

Basically, it may be said that charity or benevolence benefit the general public without restriction, in determining whether real property is occupied for charitable or benevolent purposes so as to be exempt from taxes (MCL 211.7; MSA 7.7).

5. Taxation—Real Property Taxes—Charitable Institutions—Exemptions.

A nonprofit corporate landowner which operates a residence for the elderly is not entitled to an exemption from real property taxes as a charitable institution where the residence does not serve the elderly generally but provides a retirement environment for those who meet certain health requirements and who have the ability to pay the corporation for a life-care contract at cost (MCL 211.7; MSA 7.7).

6. Taxation—Real Property Taxes—Charitable Institutions—Exemptions—Equal Protection.

A nonprofit corporate landowner which operates a residence for the elderly was not denied equal protection of the laws because it was denied an exemption from real property taxes while another home for the elderly was granted an exemption where the residents of the nonexempt home are admitted on the basis of certain health requirements and the ability to pay for the cost of their care while the residents of the exempt home do not pay the full cost of their care and are selected on the basis of their inability to live without supervision and to obtain comparable care elsewhere (MCL 211.7; MSA 7.7).

Dissenting Opinion

Coleman, J.

7. Taxation—Real Property Taxes—Exemptions.

*The rule of strict construction of exemptions of real property from taxation requires that property claimed as exempt must be clearly within the exemption statute as interpreted by the*

courts; the nature of that interpretation must be reasonably related to the societal need at issue.

8. TAXATION—REAL PROPERTY TAXES—EXEMPTIONS.

The judicial construction of a tax exemption should always be reasonable; giving the narrowest possible meaning to words descriptive of the objects of the exemption, such as "benevolent", "charitable", "educational", and "scientific", frustrates the true intent of the constitutional and statutory provisions.

9. TAXATION—REAL PROPERTY TAXES—EXEMPTIONS—CHARITABLE INSTITUTIONS.

A charitable or benevolent institution must be a nonprofit corporation to qualify for an exemption from real property taxes; however, the charging of fees does not prevent classification of an institution as charitable so long as the fees charged do not exceed the amount required to maintain the institution at a reasonable standard of operation (MCL 211.7; MSA 7.7).

10. TAXATION—CHARITABLE INSTITUTIONS—HOMES FOR THE AGED.

The concept of a charitable institution is not confined to the relief of the needy and destitute; aged people require care and attention apart from financial assistance, and the supply of this care and attention is as much a charitable purpose as the relief of their financial wants.

11. TAXATION—REAL PROPERTY TAXES—EXEMPTIONS—CHARITABLE INSTITUTIONS.

A purpose of a nonprofit corporation claiming tax exempt status is charitable if its accomplishment is of such social interest to the community as to justify the property being devoted to the purpose in perpetuity; there is no fixed standard to determine what purposes are of such social interest to the community, because the interests of the community vary with time and place (MCL 211.7; MSA 7.7).

12. TAXATION—REAL PROPERTY TAXES—EXEMPTIONS—CHARITABLE INSTITUTIONS.

A nonprofit corporate landowner which operates a residence for the elderly is entitled to an exemption from real property taxes as a charitable institution where the residents must be over 65 years old, need not be affiliated with the religious group which financed the residence, plan to remain in the home for life or indefinitely, pay fees for the services of the residence based upon costs of operation, and are not evicted if they cannot pay for the services rendered (MCL 211.7; MSA 7.7).

*Foster, Swift & Collins, P. C.,* for plaintiff.

*R. Bruce Laidlaw,* Chief Assistant City Attorney, for defendant City of Ann Arbor.

*Amici Curiae:*

*DeVine & DeVine* (by *Allyn D. Kantor)* for Public Schools of the City of Ann Arbor.

*Hackler, Londerholm, Speer, Vader & Austin* (by *Eugene T. Hackler* and *Peter V. Ruddick)* for the Michigan Non-Profit Homes Association and the American Association of Homes for the Aging.

FITZGERALD, J. The principal issue on appeal is whether a home for the aged, Hillside Terrace, owned and operated by plaintiff, is entitled to a statutory exemption from the payment of ad valorem property taxes for the tax years 1971–72 as property owned and occupied by a benevolent or charitable institution solely for the purposes for which said institution was incorporated.[1] Plaintiff

---

[1] Paragraph "Fourth" of § 7, being MCLA 211.7; MSA 7.7, of the General Property Tax Act read at times here relevant in part as follows: "Fourth, Such real estate as shall be owned and occupied by library, benevolent, charitable, educational or scientific institutions and memorial homes of world war veterans incorporated under the laws of this state with the buildings and other property thereon while occupied by them solely for the purposes for which they were incorporated. Also charitable homes of fraternal or secret societies." As amended by 1974 PA 358, § 1, eff April 1, 1975, that portion of § 7 now reads:

"Fourth, Such real estate or personal property as shall be owned and occupied by nonprofit theater, library, benevolent, charitable, educational, or scientific institutions and memorial homes of world war veterans incorporated under the laws of this state with the buildings and other property thereon while occupied by them solely for the purposes for which they were incorporated. Also charitable homes of fraternal or secret societies and nonprofit corporations whose stock is wholly owned by religious or fraternal societies which own and operate facilities for the aged and chronically ill, in which no part of the net income from the operation of such corporations inures to the benefit of any person(s) other than the residents."

also maintains that the state is constitutionally required to extend to it the benefits of the separate exemption contained in § 7d of the General Property Tax Act.[2] Finally, plaintiff asserts that it is a denial of equal protection to grant an exemption to the Anna Botsford Bach Home, which is owned and occupied by the Old Ladies Home Association of Ann Arbor, and to deny plaintiff the same exemption under §§ 7 and 9 of the General Property Tax Act.

The exemption claimed by plaintiff was denied by the Ann Arbor City Assessor. This action was affirmed by the Ann Arbor Board of Review, by the State Tax Commission, and by the Court of Appeals at 55 Mich App 725; 223 NW2d 324 (1974). We likewise affirm.

---

Although special reference is made in the amended statute to non-profit corporations whose stock is wholly owned by religious societies which own and operate facilities for the aged, nevertheless the language added refers back to the words *"charitable* homes".

Likewise, at times here relevant, paragraph "First" of § 9, being MCLA 211.9; MSA 7.9, of the General Property Tax Act read as follows:

"First, The personal property of benevolent, charitable, educational and scientific institutions, incorporated under the laws of this state: Provided, That such exemptions shall not apply to secret or fraternal societies, but the personal property of all charitable homes of such societies shall be exempt." As amended by 1974 PA 83, § 1, that portion of § 9 now reads:

"(a) The personal property of charitable, educational, and scientific institutions, incorporated under the laws of this state. The exemptions shall not apply to secret or fraternal societies, but the personal property of all charitable homes of such societies and non-profit corporations which own and operate facilities for the aged and chronically ill, in which no part of the net income from the operation of such corporations inures to the benefit of any person(s) other than the residents shall be exempt."

Although less clear than with the amended § 7, it would seem that the added language in § 9 refers back to the words "the personal property of all *charitable* homes." It would appear, therefore, that the issue which confronts this Court, being essentially one of statutory construction, would not be less difficult under the statute as amended.

[2] MCLA 211.7d; MSA 7.7(4a).

FACTS

Plaintiff is a Michigan nonprofit corporation whose purposes as set forth in article II of its articles of incorporation are as follows:

"To acquire or erect, and to equip, conduct, and maintain on the broadest Christian principles of service to humanity, nursing and convalescent homes, and homes for the aged, or other institutions for the care of the mentally and physically handicapped, the sick, disabled, aged or destitute persons.

"The purpose of the organization of this corporation is for the general welfare and not for profit and any income derived therefrom shall not be paid out on dividends to any person or corporation, but shall be used for benevolent, charitable and general welfare purposes, and only for the purposes of such institutions organized hereunder. Any receipts of this organization in excess of the expenses of purchase or erection and maintenance of said institution or institutions provided for herein shall be applied to the care of charity patients and to the equipment and enlargement of said institutions."

In addition to its Hillside Terrace facility, plaintiff has established and operates three other retirement centers: Olds Manor in Grand Rapids, Whittier Towers in Detroit, and Whitcomb Tower in St. Joseph. As of the date of the proceedings before the State Tax Commission, the Grand Rapids and Detroit Assessors had exempted the real and personal property used in connection with the Olds Manor and Whittier Towers facilities. The Whitcomb Tower facility had not yet been opened for operation.

The Hillside Terrace facility at issue was constructed between June 1968 and October 1969 at a cost of $2,742,953.30. It has been licensed by the

State Department of Health as a home for the aged. The residence facility consists of 55 one- and two-bedroom apartments of which there are five basic designs, ranging from the most modest at 252 square feet to the largest at 504 square feet. Each apartment is equipped with air-conditioning, wall-to-wall carpeting, and safety features, and has a private bath attached. Other features of the residential complex include a central dining room, a library, a chapel, solariums, and areas for recreational activities. There is also a 23-bed health center which has been licensed as a nursing home.

Although contributions to plaintiff are deductible for Federal income, estate and gift tax purposes, there is no indication that contributions have ever been solicited or received by plaintiff for use in connection with Hillside Terrace. Construction and initial start-up costs were financed by bank mortgage loans and by the sale of debentures. The debentures are sold mainly through churches affiliated with the Michigan Baptist Convention, which also guaranteed the mortgage notes. The debentures are of several series, with maturities ranging from 90 days to 15 years, and bear interest from 5% to 8%.

Plaintiff's mortgage and debenture obligations are met by the fees charged to its residents. The fees of Hillside Terrace were structured with the aim that the facility would be self-supporting and self-liquidating. Each resident of Hillside Terrace pays, upon admission, a life-lease fee which, in 1970, ranged between $8,000 and $20,000. The amount of the life-lease fee is based on the size of the apartment rented. The average life-lease fee paid through 1970 was approximately $11,000. The residency contract provides that, in the event of death after occupancy, the life-lease fee and all other sums paid to plaintiff shall be forfeited to

plaintiff. Amounts thus forfeited are not treated by plaintiff as income in the year of death, but are amortized over the deceased's actuarial life expectancy.

In addition to the life-lease fee, each resident pays a monthly service charge for daily meals, maid and bed-linen service. Dry cleaning and the laundry of personal apparel are specifically not included in this charge. The monthly service charge is likewise based upon the number of square feet in the apartment rented. During 1970, this fee ranged between $240 and $440 per month. The average monthly service charge was $283.

Each resident is provided 10 days of free care in the nursing center each year. This benefit may be accumulated to a maximum of 30 days. Physicians' fees, drugs, dental and optical care are extra.

Plaintiff offered testimony to the effect that during 1970 the monthly service charge to 4 of its 72 Hillside Terrace residents was reduced because of special consideration given to the financial status of these residents. The extent of the reduction was not made clear. Plaintiff also proved that there were two instances during 1970 where life-lease fees were waived.

With but few exceptions above noted, ability to pay all fees is a factor determining whether an applicant will be admitted to Hillside Terrace. Although it is plaintiff's policy not to evict anyone because of that person's financial reverses, plaintiff's rules state that there is a corresponding responsibility on all residents to care properly for financial resources. To determine whether these resources are sufficient to begin with, each applicant is asked to make a rather complete disclosure of assets and income.

Based on the information disclosed on the appli-

cation forms, plaintiff attempted to establish before the commission income and net worth averages for Hillside Terrace residents as of December 31, 1970. However, the data on which these averages were based contained a great number of exceptions and omissions. Many residents failed to disclose all assets, and others disclosed only the fact that assets exceeded a certain amount. Even by plaintiff's low estimates, average yearly income was $6,811 and average net worth was $74,274. One resident did disclose assets of over one-half million dollars, while seven others listed assets of over one-quarter million.

During plaintiff's fiscal years ending September 30, 1970 and 1971, the initial years of Hillside Terrace's operations, the facility lost $148,460 and $191,332 respectively. The losses may be accounted for by such nonoperational expenses as depreciation, amortization and interest. One of plaintiff's officers stated that if such losses continued, plaintiff would raise resident fees to eliminate the deficit. As previously noted, the fee structure had been designed so that the facility would be self-supporting and self-liquidating.

In addition to the financial restrictions upon admission, there are strict health requirements. Prior to admission, each applicant must submit to a physical examination. Applicants must be at least 65 years of age, must be in reasonably good health, and must be free of all contagious or objectionable diseases. Applicants must demonstrate ability to maintain themselves in apartments and take meals in the dining facility without the aid of nursing personnel.

I.

Exemption from taxation effects the unequal

removal of the burden generally placed on all landowners to share in the support of local government. Since exemption is the antithesis of tax equality, exemption statutes are to be strictly construed in favor of the taxing unit.[3] In examining the facts upon which each case will necessarily turn, a four-part test has evolved for claims based on paragraph "Fourth" of § 7 of the General Property Tax Act:

"(1) The real estate must be owned and occupied by the exemption claimant;

"(2) The exemption claimant must be a library, benevolent, charitable, educational or scientific institution;

"(3) The claimant must have been incorporated under the laws of this State;

"(4) The exemption exists only when the buildings and other property thereon are occupied by the claimant solely for the purposes for which it was incorporated."[4]

If the four-part test is met, the fact that charges approximating cost are made for services and benefits offered by the exemption claimant does not alone defeat the exemption claim.[5] On the other hand, exempt status requires more than a mere showing that services are provided by a nonprofit corporation.

That plaintiff has satisfied parts one and three of the test above set forth is not in controversy. Regarding parts two and four, while it is clear that the purposes of plaintiff as set forth in its articles

[3] *St. Joseph's Church v Detroit*, 189 Mich 408; 155 NW 588 (1915). *Evanston YMCA Camp v State Tax Commission*, 369 Mich 1; 118 NW2d 818 (1962).

[4] *Engineering Society of Detroit v Detroit*, 308 Mich 539, 550; 14 NW2d 79 (1944). *See, also, Gull Lake Bible Conference Assn v Ross Township*, 351 Mich 269, 273; 88 NW2d 264 (1958).

[5] *See Gull Lake Bible Conference Assn, supra.*

are benevolent, charitable, and general welfare purposes, we are of the opinion that Hillside Terrace was not occupied for what would traditionally be called charitable or benevolent objectives during the years in question. Basically, it may be said that charity or benevolence benefit the general public without restriction.[6] On this record, it appears that the management of Hillside Terrace does not serve the elderly generally, but rather provides an attractive retirement environment for those among the elderly who have the health to enjoy it and who can afford to pay for it. Plaintiff's health and financial limitations on admission cannot be said to benefit the elderly as a general proposition. By purchasing a life-care contract at cost through plaintiff, the residents of Hillside Terrace have provided for themselves. Furthermore, we cannot presume that the Legislature intended to grant the claimed exemptions to these relatively favored individuals while at the same time granting only limited property tax relief to the less affluent elderly who rent or own modest homes. In the years here at issue, those taxpayers age 65 or over who met certain residency and income limitations could obtain only a partial exemption of $2,500 in state equalized valuation if their homestead did not exceed $10,000 in SEV.[7] Under this statute, no revenue was lost to the local taxing unit since the partial exemption was subsidized by the state. At present, the limited senior citizen tax relief just described has been replaced by an allowance of special credits against state income tax liability for expenditures for rent and taxes.[8] We are convinced that the Legislature

---

[6] *Auditor General v R B Smith Memorial Hospital Assn*, 293 Mich 36, 38; 291 NW 213 (1940).

[7] MCLA 211.7c; MSA 7.7(4), repealed by 1973 PA 20, § 2.

[8] *See* MCLA 206.522; MSA 7.557(1522).

has given no clear mandate to exempt elderly housing per se, and that there is no difference compelling exemption between the housing offered by plaintiffs and that sought to be affected by the above-described statutory schemes.

In so holding, we do not mean to be understood as saying that Hillside Terrace does not serve a valuable social purpose. The Michigan Non-Profit Homes Association and the American Association of Homes for the Aging, as amici curiae, draw our attention to the national policy of promoting programs and facilities which ease the "retirement shock" to which an ever increasing number of our aging are exposed.[9] Our attention is also called to decisions of other jurisdictions, some of which have ruled in favor of exemption under the facts and constitutional or statutory language there in controversy.[10] Within constitutional directions and limitations, our Legislature is free to exercise its exemption power as it chooses.[11] Whether exemption from taxation of facilities such as Hillside Terrace would result in a benefit to the public commensurate with the loss of tax revenue is a legislative determination. Under our statute and under these facts, we cannot say that the Legislature intended that Hillside Terrace be exempt.

## II.

By 1966 PA 312, § 1, being MCLA 211.7d; MSA

[9] *See* the White House Conference on Aging Act, 72 Stat 1746, Public Law 85-908 (Sept 2, 1958).

[10] *See generally* Anno: *Homes for the Aged as Exempt from Property Taxation,* 37 ALR3d 565–604.

[11] *United States Cold Storage Corp v Detroit Board of Assessors,* 349 Mich 81, 91; 84 NW2d 487 (1957). *See, also,* Const 1963, art 9, § 4, which exempts "[p]roperty owned and occupied by nonprofit religious or educational organizations and used exclusively for religious or educational purposes, as defined by law * * * ".

7.7(4a), the Legislature did intend to subsidize an exemption for certain low-income senior citizen housing of modest design and material:

"(1) Housing owned and operated by a nonprofit corporation or association or by the state, any political subdivision thereof or instrumentality, for occupancy or use by elderly persons shall be exempt from all general property taxation by the state, city, village or county, or by any public body or agency.

\* \* \*

"(4) 'Nonprofit corporation or association' means any corporation or association incorporated under the laws of this state not otherwise exempt from general ad valorem real and personal property taxes operating a housing facility or project *qualified, built or financed under section 202 of the national housing act of 1959, as amended."* (Emphasis supplied.)

It is important to note that this exemption does not result in loss of revenue to the local taxing unit, since subsection 5 provides for reimbursement from the state directly to the local unit.

Plaintiff contends that this exemption must, of constitutional necessity, be made available to it. Plaintiff argues that subsection 4, by making the exemption depend upon Federal financing pursuant to § 202 of the National Housing Act of 1959,[12] is an unconstitutional delegation of legislative authority to the Secretary of Housing and Urban Development.

The intent of the Legislature in enacting MCLA 211.7d is manifest. It would not be possible, without doing violence to that intent, to allow a facility such as Hillside Terrace to qualify under the statute by striking down subsection 4 while giving effect to the remaining portions of the exemption.

---

[12] 12 USC 1701q.

Therefore, in view of our determination that resolution of the issue could have no effect on plaintiff's property tax liability, we decline to address the issue of the constitutionality of MCLA 211.7d.

## III.

Finally, plaintiff contends that it has been denied the equal protection of the laws guaranteed by Const 1963, art 1, § 2, and US Const, Am XIV because it has been denied the exemptions which it seeks while the Anna Botsford Bach Home, housing 17 elderly women and owned and operated by the Old Ladies Home Association of Ann Arbor, has been exempted under §§ 7 and 9 of the General Property Tax Act. We agree with the Court of Appeals that the differences between the Bach Home and Hillside Terrace are readily apparent, and that the contention that plaintiffs must be classified like the Bach Home for purposes of exemption is without support on the record. The Bach Home was endowed by and is partially financed through charitable contributions. Annual operating deficits are met by withdrawals of principal and interest from its endowment fund, and by annual contribution drives. None of the Bach Home residents pays the actual cost of her care, and the various payment plans there in effect were not designed with that goal in mind. The overriding criteria for admissibility to the Bach Home is the applicant's inability to live without supervision. To be contrasted with Hillside Terrace's rigid health and financial requirements is the Bach Home policy of giving priority to those applicants who are unable to obtain comparable care elsewhere.

The Court of Appeals is affirmed. No costs, a public question being involved.

KAVANAGH, C. J., and LEVIN, J., concurred with FITZGERALD, J.

WILLIAMS, LINDEMER, and RYAN, JJ., took no part in the decision of this case.

COLEMAN, J. *(dissenting).* Although it is agreed that tax exemption statutes are strictly construed in favor of the taxing unit, this generally accepted rule of law should not work to divert an exemption statute from its intended purpose toward meeting certain needs of society.

The facts of the case are well stated in Justice FITZGERALD's opinion, but a few are of particular relevance to this dissent:

1. Those who may be admitted to the nonprofit church-affiliated home for the elderly, Hillcrest Terrace, must be over 65 years old. They need not be Baptists.

2. The residents have an average annual income of approximately $6,811 and plan to remain in the home for life or indefinitely. Although some have little, if any, income and others are more affluent, the home serves primarily the middle financial strata of the elderly.

3. Residents are not evicted if they cannot pay for the services rendered.

4. Some have been and purportedly will be admitted without payment of the "life lease".

5. Limited free care is available in the nursing center to any resident needing it.

6. The Michigan Baptist Convention has guaranteed the mortgage notes.

7. The home had been operating at a sizable loss at the time of this suit, although it is intended to be self-sustaining. If self-sustaining, the residents' fees must be adjusted higher. If the home is not tax-exempt, an estimated $55,000 annually in taxes will be added to the costs of residents. (There were 72 at the time of suit.)

For the tax years in issue (1971–1972), MCLA 211.7; MSA 7.7 exempted from property taxation:

"Such real estate as shall be owned and occupied by * * * benevolent, charitable, educational or scientific institutions * * * ."[1]

And MCLA 211.9; MSA 7.9 exempted:

"The personal property of charitable, educational and scientific institutions * * * "[2]

The relevant parts of the exemption statutes are phrased in the general terms of "charitable" or "benevolent" institutions.[3] Exemption statutues are strictly construed. However, it does not follow that the construction of "benevolent", "charitable", "educational", "scientific" or other general exemptions should be carved in granite. This would restrict adjustments consistent with the changing perceptions of society.

The rule of strict construction is best viewed as

---

[1] A 1974 amendment added the following provision:

"Also charitable homes of * * * nonprofit corporations whose stock is wholly owned by religious or fraternal societies which own and operate facilities for the aged and chronically ill, in which no part of the net income from the operation of such corporations inures to the benefit of any person(s) other than the residents." 1974 PA 358, § 1, eff April 1, 1975.

[2] A 1974 amendment added the following provision:

"The personal property of all charitable homes of * * * non-profit corporations which own and operate facilities for the aged and chronically ill, in which no part of the net income from the operation of such corporations inures to the benefit of any person(s) other than the residents shall be exempt." 1974 PA 83, § 1.

[3] The Legislature employs the separate designations of "benevolent" and "charitable" institutions from which we may infer separate meanings. There is little case law on the subject, and it is inconsistent. Although "benevolent" may well be more liberally interpreted than "charitable", this dissent is directed toward the more narrow meaning of the term "charitable", as proposed by the prevailing opinion.

requiring that the property claimed as exempt must be clearly within the exemption statute as interpreted by the courts. The nature of that interpretation should be reasonably related to the societal need at issue. It need not be severe or harsh. For example, I would approve the view of the North Dakota Supreme Court regarding strict construction of exemption statutes. In *Evangelical Lutheran Good Samaritan Society v Board of County Commissioners, Ramsey County,* 219 NW2d 900, 905 (ND, 1974), that Court stated:

" 'The theory that the rule requiring strict construction of a tax exemption statute demands that the narrowest possible meaning should be given to words descriptive of the objects of it would establish too severe a standard. A liberal and not a harsh or strained construction is to be given to the terms "educational," "religious," and "charitable" in order that the true intent of the constitutional and statutory provisions may be realized. The judicial interpretation of such statute should always be reasonable.' "

The ultimate question which must be answered is: What factors should exist for designation of an institution as charitable or benevolent?

I believe that Michigan should follow the lead of other states and examine two criteria: (1) nonprofit status; and (2) beneficial interest to society.

A charitable or benevolent institution must be a nonprofit operation. However, the charging of fees equal to costs does not negate a nonprofit status.

In *Fredericka Home for the Aged v San Diego County,* 35 Cal 2d 789, 793; 221 P2d 68, 70–71 (1950), the California Supreme Court stated:

"So the charge of fees by such an institution as a home for the aged will not necessarily prevent its classification as charitable if such sums 'go to pay the

expenses of operation and not to the profit of the
founders or shareholders,' for all persons may 'under
certain conditions be proper objects of charity.'

\* \* \*

"*[T]he controlling consideration in determining
whether an institution such as plaintiff should be classi-
fied as a charitable one is not whether a few or all of
the recipients of its benefits may make reasonable
contributions toward defraying the cost of such benefits,
but whether such contributions as are made do not
exceed what is required for the maintenance of the
institution at a reasonable standard* and are devoted to
the purposes for which the institution was founded,
which purposes, in the absence of the required contribu-
tions, would clearly be deemed to be charitable." (Em-
phasis added.)

Although the elderly here concerned have vary-
ing degrees of wealth, *Fifield Manor v Los Angeles
County,* 188 Cal App 2d 1, 20; 10 Cal Rptr 242
(1961)[4] is applicable. The California Court of Ap-
peals stated:

"In the light of these authorities it seems clear that a
home for the aged which caters to wealthy persons and
furnishes them those services and care needed by the
old and infirm, rich or poor, does not cease to be a
charitable institution so long as its charges do not yield
more than actual cost of operation; that it does cease to
have that status when the occupants pay more than the
cost to the home, thus resulting in a profit and convert-
ing it into a noncharitable institution."

I can say without reservation that plaintiff is a
nonprofit organization.

---

[4] *See also, State Board of Tax Commissioners v Methodist Home for
the Aged,* 143 Ind App 419; 241 NE2d 84 (1968); *Bozeman Deaconess
Foundation v Ford,* 151 Mont 143; 439 P2d 915 (1968); *Four Freedoms
House v City of Philadelphia,* 443 Pa 215; 279 A2d 155 (1971);
*Presbyterian Homes Tax Exemption Case,* 428 Pa 145; 236 A2d 776
(1968).

Discussion of the second criterion might best be understood by first looking at what is *not* important for the charitable and benevolent designation. First, charity and benevolence are not limited to relief of poverty:

"The concept of charity is not confined to the relief of the needy and destitute, for 'aged people require care and attention apart from financial assistance, and the supply of this care and attention is as much a charitable and benevolent purpose as the relief of their financial wants.' "

*Fredericka, supra,* at 792, quoting *Estate of Henderson,* 17 Cal 2d 853, 857; 112 P2d 605, 607 (1941).

" 'Relief of poverty is not a condition of charitable assistance. If the benefit conferred has a sufficiently widespread social value, a charitable purpose exists * * * .' "

*Fifield, supra,* at 11–12, quoting *Henderson, supra,* at 857.

"To qualify as a charity does not require that it have an exclusive relationship to the poor * * * ."

*Bozeman, supra,* at 148.

Second, the high quality of the facilities and care should not affect charitable and benevolent status:

"It may be that appellants feel the standard of care, the excellence of accommodations, and the mode of life accorded by this facility, all reflected by the size of the occupancy and maintenance fees, and the physical plant and facilities available are inconsistent with the usual concept of charity. But 'charity' to the law has a

much broader meaning than that accorded it in common speech (15 Am Jur 2d, p 8)." *Id* 149.

Further, it is not agreed that the institution must open its doors indiscriminately to any elderly applicant regardless of health or financial condition in order to qualify as "charitable" or "benevolent". In fact, it might well be encouraged not to do so because better service may be provided. Here, plaintiff does not purport to be a nursing home staffed and equipped to care for the chronically ill, although it does provide free beds and nursing care for short-term illness. Although nonprofit, it does propose to be self-sustaining.

The second proposed criterion, beneficial interest to society, is not a novel idea. The Supreme Court of Montana recognized current social needs: "The scope of charity and the standards under which it is administered are not frozen by the past, but keep pace with the times and the new conditions and wants of society." *Bozeman, supra,* at 149.

The 2 Restatement Trusts, 2d, § 368, recognizes the following as charitable purposes:

"(a) the relief of poverty;
"(b) the advancement of education;
"(c) the advancement of religion;
"(d) the promotion of health;
"(e) governmental or municipal purposes;
"(f) other purposes the accomplishment of which is beneficial to the community."

In the comments under § 368, the Restatement notes:

"The common element of all charitable purposes is that they are designed to accomplish objects which are beneficial to the community.

\* \* \*

"A purpose is charitable if its accomplishment is of such social interest to the community as to justify permitting the property to be devoted to the purpose in perpetuity.

"There is no fixed standard to determine what purposes are of such social interest to the community; the interests of the community vary with time and place.[5]

Thus, the basic question in the instant appeal becomes: Is plaintiff of sufficient beneficial interest to society as to qualify as a charitable and benevolent institution?[6]

The answer should be affirmative. Problems brought on by old age are rendered more acute by ever longer life expectancies and cause institutions such as plaintiff to be of beneficial interest to society. The Supreme Court of Pennsylvania has well expressed the reasons for such interest:

"Moreover, the social need of governmental and charitable caring for the aged, as well as the importance and necessity for such a benevolent public policy, have become widely recognized and accepted, as medical science in the United States constantly lengthens life expectancy with its resulting increase in the number of needy aged. The elderly, even those who are not completely incapacitated physically, suffer from loneliness, and from mental and physical infirmities which tend to increase as they grow older and their children leave the family home and their contemporaries move away or die. *With each passing year, they usually become less and less able to cope with the day-to-day problems of*

---

[5] The Supreme Court of Pennsylvania also recognized the view of the Restatement:

" ' "Whether a purpose is charitable must be ascertained from a consideration of all surrounding circumstances. A design to achieve objects beneficial to the community is common to all charitable purposes. \* \* \* The concept of charity is continually broadening." ' " *Presbyterian Homes, supra,* at 150.

[6] The nonprofit status of plaintiff presents no problem.

*life, including the management of their homes, their
proper maintenance and support, and even, at times,
their adequate nourishment; and they often live in fear
and dread of illness or of some physical disability or
possible poverty, or of just plain inability to adequately
take care of themselves.* It is certainly in the public
interest and public welfare that homes and other facili-
ties be established and maintained to relieve these
worries and anxieties, these fears and sufferings, and
this well-known inability of the aged to adequately care
for themselves. Furthermore, it is a matter of common
knowledge that pension plans, retirement benefits, and
Government-supported programs for the support and
care of the elderly greatly aid, but simply *do not solve*
all of the underlying human problems of the aged."
(Emphasis added.) *Presbyterian Homes, supra,* at 151.[7]

I fail to find legislative intent *not* to exempt
plaintiff in the partial tax relief accorded senior
citizens owning their own homes. MCLA 206.522;
MSA 7.557(1522). The majority opinion concludes
that a full exemption for plaintiff is inconsistent
with such partial tax relief. However, the concerns
for plaintiff and institutions of its kind are differ-

---

[7] The California courts also recognize the special needs of the
elderly:

"The courts have long recognized and declared that charity is not
limited to giving alms, is not confined to relief of the poor, may
extend to the rich in areas where they are not able to care for
themselves, and extends to those social objectives which promote the
general welfare and would be served by the government in the
absence of philanthropic enterprises such as homes for the aged.
*Historically, and well-nigh unanimously, the courts have found homes
for the aged to be charitable institutions where conducted at cost or
less. They have also recognized that man, especially the old, does not
live by bread alone; that though he be able to pay for all material
wants he nevertheless may be dependent upon his fellow man or the
government to protect him from the haunting fear of loss of all his
property with resultant poverty, fear of illness or other physical
disability overtaking him with no one near to help, fear of the
loneliness arising from absence of social contacts, fear of any of the
tragedies of old age where there is no one standing by to help."*
(Emphasis added.)

*Fifield, supra,* at 11.

ent from those concerns in MCLA 206.522, *supra.*
The special needs of senior citizens are such that
an institution such as plaintiff should be encour-
aged through property tax exemption as a charita-
ble or benevolent institution. Many critical needs
can only be met by such an institution.

Finally, it is notable that the Internal Revenue
Service exempted plaintiff from income tax as a
corporation organized for charitable purposes un-
der Int Rev Code of 1954, § 501(c)(3). Rev Rul 72-
124 applies to plaintiff:

> "[I]t is now generally recognized that the aged, apart
> from considerations of financial distress alone, are also,
> as a class, highly susceptible to other forms of distress
> in the sense that they have special needs because of
> their advanced years. For example, it is recognized in
> the Congressional declaration of objectives, Older Amer-
> icans Act of 1965, Public Law 89-73, 89th Congress, 42
> USC 3001, that such needs include suitable housing,
> physical and mental health care, civic, cultural, and
> recreational activities, and an overall environment con-
> ducive to dignity and independence, all specially de-
> signed to meet the needs of the aged. Satisfaction of
> these special needs contributes to the prevention and
> elimination of the causes of the unique forms of 'dis-
> tress' to which the aged, as a class, are highly suscepti-
> ble and may in the proper context constitute charitable
> purposes or functions even though direct financial as-
> sistance in the sense of relief of poverty may not be
> involved.
>
> "Thus, an organization, otherwise qualified for chari-
> table status under section 501(c)(3) of the Code, which
> devotes its resources to the operation of a home for the
> aged will qualify for charitable status for purposes of
> Federal tax law if it operates in a manner designed to
> satisfy the three primary needs of aged persons. These
> are the need for housing, the need for health care, and
> the need for financial security.

\* \* \*

"The need for financial security, i.e., the aged person's need for protection against the financial risks associated with later years of life, will generally be satisfied if two conditions exist. First, the organization must be committed to an established policy, whether written or in actual practice, of maintaining in residence any persons who become unable to pay their regular charges." 1 Internal Revenue Bulletin 1972, pp 145, 146–147.

The reasoning of Rev Rul 72-124 is in particular application to the instant case.

In short, I would find that, under the facts as well stated in the majority opinion, plaintiff is entitled to an exemption as a "charitable" or "benevolent" institution. The special problems of our increasing population of older Americans require that the exemption statute be interpreted to meet the needs of society as they exist.

At this writing, the young do not generally take into their homes older family members as was past custom. Although some may have enough money to exist alone, we now see life as embracing more than a roof over the head and food for the body. Not only the indigent and those physically or mentally disabled need our individual, legislative, or judicial compassion, but those who may be lonely, afraid or emotionally starved. There are those who cannot cope with the everyday chores of a house or an apartment and who suffer other physical and mental deprivations while alone. The persons or groups who, at no profit to themselves, provide for such needs under the circumstances of this case are engaged in a "charitable" or "benevolent" undertaking which is of particular benefit to the community.

I would find that plaintiff comes within the definition of the legislatively provided exemption, and, therefore, would reverse.