UNITED CHURCH OF CHRIST *v.* TOWN OF
WEST HARTFORD
(3835)

HULL, BORDEN and SPALLONE, Js.

*(One judge dissenting)*

Argued October 8, 1986—decision released January 20, 1987

*Richard T. Stabnick,* for the appellant (plaintiff).

*Marjorie Wilder,* with whom, on the brief, was *R. Bartley Halloran,* for the appellee (defendant).

HULL, J. This appeal involves the narrow issue of whether the court erred when it found that the land involved in the plaintiff church's Hart Meadow housing project in West Hartford was not being used exclusively for charitable purposes within the meaning of General Statutes § 12-81 (7),[1] and thus was not qualified for local property tax exemption under General Statutes § 12-88.[2]

The town assessor of West Hartford placed the housing units then constructed on the tax list of October 1, 1982. The plaintiff church appealed to the board of tax review for the town of West Hartford, seeking tax exempt status on the ground that the real estate was used exclusively for a charitable purpose. The board denied the petition for tax exempt status.

The plaintiff appealed to the Superior Court, which found the property nonexempt and dismissed the appeal. The court concluded that the plaintiff church had not proved (1) that the project is not and will not be self supporting, and (2) that the individuals admitted to the project, by virtue of their admission, would be less likely to burden society and more likely to become useful citizens.

The court found the following facts which are not in dispute. The plaintiff church is a charitable corpora-

---

[1] General Statutes § 12-81 provides in pertinent part: "The following-described property shall be exempt from taxation: . . . (7) Property used for scientific, educational, literary, historical or charitable purposes. Exception. Subject to the provisions of sections . . . 12-88, the real property of . . . a corporation organized exclusively for scientific, educational, literary, historical or charitable purposes or for two or more such purposes and used exclusively for carrying out one or more of such purposes . . . ."

[2] General Statutes § 12-88 provides in pertinent part: "Real property belonging to, or held in trust for, any organization mentioned in subdivision (7), (10), (11), (13), (14), (15), (16) or (18) of section 12-81, which real property is so held for one or more of the purposes stated in the applicable subdivision, and from which real property no rents, profits or income are derived, shall be exempt from taxation . . . ."

tion, incorporated as a nonstock corporation in 1958. It acquired about six acres of land on Flagg Road in West Hartford on which it erected a church building. It used about two acres of the property for its church purposes, leaving about four acres of open land unused, on which it paid taxes to the town of West Hartford. After perceiving a need for housing for the elderly in the community, the church, in 1978, created a committee to make a feasibility study of the use of the unoccupied land for such housing. The study became known as the Hart Meadow Project. In November, 1979, the congregation, at a meeting called "to discuss the Hart Meadow project," voted: "Whereas our congregation feels that a portion of our outreach ministry can be accomplished by the provision of housing on our property for the elderly, and Whereas Phase I of the Feasibility Study has reviewed plans and concepts for such housing which are felt to accomplish our intended purpose and, Whereas there is reason for optimism of success through the efforts of our congregation with guidance and assistance from Church Homes and the Connecticut Conference, it is therefore Moved that the congregation authorize the expenditure by the Hart Meadow Project Committee of approximately $7,000 of church funds so that they may proceed with Phase II of the Feasibility Study involving detailed planning and a zoning application with the town government. If the project is successful, the $7,000 will become part of the capitalization expense and will be returned to the church."

The church obtained a change of zone for the entire six acre parcel to be designated as a special zoning district and proceeded with a development of the four acres to be known as Hart Meadow Village. The plaintiff was to construct sixteen residential units or cottages, each with two bedrooms and equipped with range, refrigerator, air conditioning, carpeting, gar-

bage disposal, master television antenna, and provided with grounds maintenance, project lighting and on-site parking. It is also planned that, in time, the entire project would be administered by Church Homes, Inc., as a subsidiary of its Avery Heights project on New Britain Avenue in Hartford. It is also planned that a full range of recreational, support and health services will be provided for the occupants of the cottages, including pastoral counseling provided by the church minister, support in arranging convalescent services, use of church facilities for cultural and recreational affairs and coordination of public and private transportation.

The plaintiff plans that 87 percent of the projected total $1,212,483 cost of the project will be funded by gifts, with the remainder provided by a commercial loan to the church which will continue to hold title to all the real estate. The funds for construction of each unit will come from individual donors who will make unrestricted gifts to the church to cover the cost of construction of the units. Upon making the payment of $73,000, the individual donor will receive the privilege of being the occupant of the housing unit, as well as receiving health care, as long as he or she is able to live there independently; provided, however, that the occupant pay to the church a monthly maintenance fee now fixed at $350, and that one of the occupants at the time of taking occupancy is at least sixty-two years of age. No leases or written contracts concerning the occupancy will be executed other than a letter from the church to the occupant specifying his rights, privileges and commitments for the maintenance costs. Once a cottage is vacated, a second tenant chosen by Church Homes, Inc., will be given the privilege of occupancy under the same restrictions and subject to the same commitment to pay the monthly maintenance fee.

Six units had been constructed and were occupied at the time of trial. Plans were under way to erect the remaining planned units as the church received further donations for construction. At the hearing, it also appeared that although there had been discussions with the town authorities about what would be done if the property were sold, no understanding was ever reached. It does not appear that any provision has been made for such a contingency, or for the possibility of the church ceasing to function or deciding to sell the property. Nor has any restriction against its sale been considered. There is no restriction to occupancy by reason of race, creed, color or church membership. Most of the current occupants are not members of the plaintiff church and there is no requirement that they be members. The court found it significant that there is no restriction or limitation upon the extent of the wealth or income of anyone selected for occupancy of the units. While one of the occupants of each unit must have attained the age of sixty-two, occupancy is not limited to the poor, sick, infirm, or to the low income elderly. There is no barrier to admission to occupancy of any of the housing units by any wealthy person. The court concluded that the absence of any financial limitation is of critical significance in determining the merits of the case.

The court stated that under the statutory provisions, there are three requirements for tax exemption. The property must belong to or be held in a trust for an organization exempt from taxation under the provisions of General Statutes § 12-81; it must be held for one of the purposes stated in that statute; and it must produce no rent, profits or income. The court found that the plaintiff failed to prove that the land involved in the Hart Meadow Village project is being used "exclusively" for charitable purposes as that term is used in General Statutes § 12-81 (7).

We cite with approval, as did the trial court, the statement in *Faith Center, Inc.* v. *Hartford,* 39 Conn. Sup. 142, 473 A.2d 342 (1982), a case affirmed by the Supreme Court in 192 Conn. 434, 436, 472 A.2d 16, cert. denied, 469 U.S. 1018, 105 S. Ct. 432, 83 L. Ed. 2d 359 (1984), as follows: "Certain general principles of law govern cases such as the present ones where a party claims that property is exempt from taxation. ' "It is a settled rule of law that statutes which exempt from taxation are to be strictly construed against the party claiming an exemption." ' *Crescent Beach Assn.* v. *East Lyme,* 170 Conn. 66, 71, 363 A.2d 1045 (1976); *Wiegand* v. *Heffernan,* 170 Conn. 567, 582, 368 A.2d 103 (1976); *Hartford Hospital* v. *Board of Tax Review,* 158 Conn. 138, 147, 256 A.2d 234 (1969). 'Exemptions, no matter how meritorious, are of grace, and must be strictly construed. They embrace only what is strictly within their terms.' *Hartford* v. *Hartford Theological Seminary,* 66 Conn. 475, 482–83, 34 A. 483 (1895); *Woodstock* v. *The Retreat, Inc.,* 125 Conn. 52, 56, 3 A. 2d 232 (1938). As the Supreme Court noted in *Snyder* v. *Newtown,* 147 Conn. 374, 386, 161 A.2d 770 (1960), appeal dismissed, 365 U.S. 299, 81 S. Ct. 692, 5 L. Ed. 2d 688 (1961): 'Exemption from taxation is the equivalent of an appropriation of public funds, because the burden of the tax is lifted from the back of the potential taxpayer who is exempted and shifted to the backs of others. *Lyman* v. *Adorno,* 133 Conn. 511, 516, 52 A.2d 702 [1947]. The owners of tax exempt property in the community derive the same benefits from government as other property owners but pay no property taxes for those benefits.'

"It is also well settled that the burden of proving entitlement to a claimed tax exemption rests upon the party claiming the exemption. *Curly Construction Co.* v. *Darien,* 147 Conn. 308, 160 A.2d 751 (1960); *Burritt*

*Mutual Savings Bank* v. *New Britain,* 146 Conn. 669, 154 A.2d 608 (1959); *Cooley Chevrolet Co.* v. *West Haven,* 146 Conn. 165, 148 A.2d 327 (1959); *Forman Schools, Inc.* v. *Litchfield,* 14 Conn. Sup. 444, rev'd on other grounds, 134 Conn. 1, 54 A.2d 710 (1947)." *Faith Center, Inc.* v. *Hartford,* supra, 153–54.

The court agreed with the plaintiff that over the years the concept of what constitutes a charitable purpose has broadened. It based its conclusion on the following language in *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan,* 147 Conn. 510, 162 A.2d 700 (1960): "The definition of charitable uses and purposes has expanded with the advancement of civilization and the daily increasing needs of men. *Mitchell* v. *Reeves,* 123 Conn. 549, 554, 196 A. 785 [1938]. It no longer is restricted to mere relief of the destitute or the giving of alms but comprehends activities, not in themselves self-supporting, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and more likely that they will become useful citizens." *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan,* supra, 514–15. The court found that nothing in the project as presently planned and being implemented by the plaintiff indicates that the project is not and will not be self-supporting or that admission to the project of those who can afford to pay for entrance and living in its attractive retirement environment will "make it less likely that they will become burdens on society and more likely that they will become useful citizens."

The court concluded that the plaintiff failed to sustain its burden of proving that the real estate in question is now devoted to and used exclusively for charitable purposes and for that reason the burden of

taxation to support municipal services should be lifted from its back and "shifted to the backs of others."[3]

The defendant argues in its brief and in oral argument additional facts, not found by the court, supporting the court's conclusion that "nothing in the project . . . indicates that the project is not and will not be self-supporting." The plaintiff in its brief and in oral argument claims extensive additional factual matters

[3] The plaintiff moved the court to articulate the bases for its decision as follows:

"1. To articulate what standard or proof the trial court required the Plaintiff-appellant to meet in order to sustain its burden of proof in the tax appeal.

"2. To articulate whether the trial court found the necessity of service to or for the poor as a standard for charitable exemption under Section 12-81 (7) of the Connecticut General Statutes.

"3. For the State Trial Referee to take judicial notice of the Senior Citizen Act of 1962, Section 236 of Title 12, Section 1701 of the U.S. Code which provides that housing for the elderly is a paramount concern of the Nation and Congress.

"4. To articulate how or why, based on the evidence produced at trial and present law, the Plaintiff-appellant failed to meet the required standard of proof."

In response, the court filed a supplemental memorandum of decision as follows:

"(1) The court required that the plaintiff prove by a fair preponderance of the evidence that the property which was the subject of its appeal was exempt from taxation by the defendant town.

"(2) The Court did not find that service to or for the poor is an exclusive necessary requirement for charitable exemption under the provisions of General Statutes Section 12-81 (7) but did consider it as a significant criterion in determining whether property is being used exclusively for charitable purposes.

"(3) The Court did not take judicial notice of the Senior Citizen Act of 1962, Section 236 of Title 12, Section 1701 of the U.S. Code and was not requested to do so, nor was it called to the Court's attention at the trial. (See *Wood* v. *Wood,* 165 Conn. 777, 780 [345 A.2d 5 (1974)].)

"(4) As to the plaintiff's request that the Court articulate how and why the plaintiff failed to sustain its burden of proof, the court is unaware of what evidence may have been available to support the plaintiff's contention but, as noted in the Memorandum of Decision, it is concluded that the plaintiff failed to prove that the property in question is now devoted to and used exclusively for charitable purposes."

not found by the court to buttress its claim of entitlement to the charitable exemption. We do not consider these claims. "Ordinarily we do not ' "resort to matters extraneous to the formal record, to facts which have not been found and which are not admitted in the pleadings or exhibits which are not part of the record." ' *Grunschlag* v. *Ethel Walker School, Inc.,* 189 Conn. 316, 320, 455 A.2d 1332 (1983). References in the 'statement of facts' in a brief or references to testimony in the transcript, even if uncontradicted, do not constitute facts in the case. Where the factual basis of the court's decision is unclear, 'proper utilization of the motion for articulation serves to dispel any such ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal. "It remains the appellant's responsibility to secure an adequate appellate record, and under normal circumstances we will not remand a case to correct a deficiency the appellant should have remedied." ' *Barnes* v. *Barnes,* 190 Conn. 491, 494, 460 A.2d 1302 (1983)." *Pointina Beach Assn., Inc.* v. *Stella,* 1 Conn. App. 341, 343, 471 A.2d 970 (1984).

We concur with the court's judgment in this case. We do not consider expatiation to be necessary or instructive concerning the statutory requirement of a charitable purpose. The plaintiff conceded at trial that under the plan six millionaires could be residing in the houses already constructed. We recognize the modern trend, favorably commented on in *Camp Isabella Freedman,* to broaden the concept of charitable purpose. We conclude, however, that in this case, where the only criteria for tenancy are that one of the occupants be over sixty-two and that the prospective tenants must pay $73,000 towards the construction cost of the apartment, and where there are no limits on wealth or income, the claim that the plan is charitable is stretching the concept to the breaking point and beyond.

Two cases cogently support our view. In *Waterbury First Church Housing, Inc.* v. *Brown,* 170 Conn. 556, 367 A.2d 1386 (1976), the Supreme Court equated the meaning of "charitable" in General Statutes (Rev. to 1975) § 12-412 (h) (now § 12-412 [8]) concerning exemptions from the sales and use tax, with the term "organized exclusively for . . . charitable purposes," in General Statutes § 12-81 (7). In *Waterbury First Church Housing, Inc.,* the plaintiff nonprofit housing corporation, with financial assistance from the federal government, rented apartments to the elderly at below market rates. The federal housing administration provided a program of rent supplements to tenants whose income did not enable them to meet the rent set by the corporation. The Supreme Court in finding the plaintiff's program to be "charitable" focused on the same test enunciated in *Camp Isabella Freedman* as well as in this case. "We can take judicial notice of the fact that in recent years large sums of public funds have been expended to provide low-income housing, and the plaintiff's dedication to making private low-rental housing for elderly persons on fixed incomes a reality clearly is an effort to 'make it less likely that they will become burdens on society' and is, therefore, charitable. *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan,* supra, 515." *Waterbury First Church Housing, Inc.* v. *Brown,* supra, 561.

When the plaintiff's claim for a "charitable" exemption is reflected against the prism of *Waterbury First Church Housing, Inc.,* it becomes crystal clear that the lack of income or wealth limitations on prospective occupants and the necessity of a $73,000 up-front payment in order to secure an apartment belie the plaintiff's claim that it is entitled to tax exemption as a charity from local property tax both legally, and as a matter of social justice.

*Michigan Baptist House & Development Co.* v. *Ann Arbor,* 396 Mich. 660, 242 N.W. 2d 749 (1976) is on all fours. The plaintiff nonprofit corporation ran a home for the aged called Hillside Terrace. The issue involved was whether the real and personal property of the home was entitled to exemption from local property taxation as a charitable use. The facilities were more modest than those at Hart Meadow, consisting of very small apartments with a variety of recreational, health and support services for the elderly occupants. The project was intended to be self-supporting and self-liquidating. Each resident paid upon admission a life-lease fee which averaged $11,000 through 1970. This was forfeitable on death. Residents also paid monthly service charges.[4] With a few exceptions, ability to pay all fees determined whether an applicant would be admitted. All applicants had to be over sixty-five years of age.

In holding that Hillside Terrace was not entitled to a property tax exemption as a charitable use, the court said "while it is clear that the purposes of plaintiff as set forth in its articles are benevolent, charitable, and general welfare purposes, we are of the opinion that Hillside Terrace was not occupied for what would traditionally be called charitable or benevolent objectives during the years in question. Basically, it may be said that charity or benevolence benefit the general public without restriction. On this record, it appears that the management of Hillside Terrace does not serve the elderly generally, but rather provides an attractive retirement environment for those among the elderly who have the health to enjoy it and who can afford to pay for it. Plaintiff's health and financial limitations on admission cannot be said to benefit the elderly as a general proposition. By purchasing a life-care con-

[4] For a similar life care program, see *Whitney Center* v. *Hamden,* 4 Conn. App. 426, 494 A.2d 624 (1985).

tract at cost through plaintiff, the residents of Hillside Terrace have provided for themselves." Id., 669–70.

We also concur with the court's conclusion that the church has not proved that the project is not and will not be self-supporting. "It is . . . not the onus of this court to search the record and transcripts to determine whether the trier of fact could have reached a conclusion other than the one it did. Rather, this court must focus on the conclusion of the trial court, as well as the path by which it arrived at that conclusion, to determine whether it is legally correct and factually supported. *Rodriguez* v. *New Haven,* 183 Conn. 473, 476–77, 439 A.2d 421 (1981); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 222, 435 A.2d 24 (1980). After a review of the record and transcripts in this case, we find that the trial court could reasonably and logically conclude as it did. The decision of the trial court was not clearly erroneous in light of the evidence and pleadings in the record as a whole. See Practice Book § 3060D [now 4061]; *Damora* v. *Christ-Janer,* 184 Conn. 109, 113, 441 A.2d 61 (1981); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra, 221–22." *Zolan, Bernstein, Dworken & Klein* v. *Milone,* 1 Conn. App. 43, 47, 467 A.2d 938 (1983).

There is no error.

In this opinion, SPALLONE, J., concurred.

BORDEN, J., dissenting. A critical factor in the conclusion of the majority is the absence of any financial limitation on the occupants of the plaintiff's facility. The majority's emphasis on this factor derives from its focus on that portion of the definition concerning a charitable use and purpose " 'mak[ing] it less likely that . . . [the beneficiaries] will become burdens on society and more likely that they will become useful citizens.' " *Waterbury First Church Housing, Inc.* v.

*Brown,* 170 Conn. 556, 560, 367 A.2d 1386 (1976), quoting *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan,* 147 Conn. 510, 514, 162 A.2d 700 (1960).

I agree that *Waterbury First Church Housing, Inc.* v. *Brown,* supra, involved "low-rental housing for elderly persons on fixed incomes"; id., 561; and that factor was important to the Supreme Court's conclusion in that case of nontaxability. I do not read that case, however, to say that such a requirement is a sine qua non of a charitable use or purpose. Such a cramped reading ignores the broader, more inclusive definition of which the language in question is but a part: " 'The definition of charitable uses and purposes has expanded with the advancement of civilization and the daily increasing needs of men. *Mitchell* v. *Reeves,* 123 Conn. 549, 554, 196 A. 785 [1938]. It no longer is restricted to mere relief of the destitute or the giving of alms but comprehends activities, not in themselves self-supporting, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and more likely that they will become useful citizens. *Bader Realty & Investment Co.* v. *St. Louis Housing Authority,* 358 Mo. 747, 752, 217 S.W. 2d 489 [1949]. Charity embraces anything that tends to promote the well-doing and the well-being of social man. Ibid. An institution is charitable when its property and funds are devoted to such purposes as would support the creation of a valid charitable trust. *Davie* v. *Rochester Cemetery Assn.,* 91 N.H. 494, 495, 23 A.2d 377 [1941].' *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan,* [supra, 514]." *Waterbury First Church Housing, Inc.* v. *Brown,* supra, 560–61.

Whether a use is charitable for purposes of General Statutes § 12-81 (7) must be determined on the facts of each case. Id., 561. For me, there are several criti-

cal facts which, if viewed in light of the proper flexible standard, shorn of the absolute requirement that only low-income beneficiaries can be the recipients of charity, would support a conclusion of tax-exemption in this case.

The initial donation of $73,000 does not cover the entire cost of construction of a unit. Nor is that such a grand sum as to require a conclusion that the project is limited to the wealthy. Many middle-class elderly would realize that amount from the equity in their home upon a sale. Moreover, only the initial occupant of the apartment pays that amount. Subsequent occupants are not required to make any initial capital donation, and pay only the monthly maintenance fee. That monthly fee is now fixed at $350, again, hardly a sum which limits the program to the wealthy.

That sum purchases, not only shelter, but a package of social support services geared toward the needs of elderly people. The plaintiff's facility contemplates a full range of recreational, support and health services, including pastoral counseling, support in arranging convalescent services, use of church facilities for cultural and recreational affairs, and coordination of public and private transportation.

I believe that these facts bring the plaintiff's facility within the principles articulated by enlightened courts from other jurisdictions which have considered the tax-exempt status of similar projects. " 'Since the enactment of the Statute of Charitable Uses during the reign of Elizabeth, aid to the aged and infirm has been recognized as charitable.' Here the record shows that the plaintiff is ministering to its elderly residents at a charge which, although appreciable, is within the reach of persons in modest circumstances and is no greater than that which is required to augment the substantial amount which plaintiff is able to contribute to the

accomplishment of its purposes. There can be no doubt that arrangements for such life care contracts fill a social purpose as well as a need of the applicants for admission. Approaching those years when the physical and mental faculties normally decline over an indefinite period of time and being faced with the prospect of expending increased but indeterminable amounts for care during that period, the applicants, by means of such life care contracts, avoid the need of living in penury occasioned by the haunting fear that they will exhaust their meagre resources and become public charges." *Fredericka Home for the Aged* v. *San Diego,* 35 Cal.2d 789, 794–95, 221 P.2d 68 (1950).

"The elderly have been recognized as a disadvantaged and distressed group with definite needs calling for special attention. Poverty is 'only one form of distress to which the elderly as a class are particularly susceptible.' Rev. Rul. 79-19, 1979-1 C.B. 195, 196. Both Congress and the state legislature have acknowledged a duty and responsibility to enable aged persons to lead more secure and independent lives. See the Older Americans Act of 1965, Pub. L. No. 89-73 § 101, 79 Stat. 219; HRS Chapter 349, S.L.H. 1976, c. 217. Among the entitlements of the elderly delineated in the Older Americans Act and HRS Chapter 349 are '[s]uitable housing, independently selected, designed and located with reference to special needs and available at costs which older citizens can afford . . . [and] [r]etirement in health, honor, and dignity.'

"Private efforts to provide food, shelter, health care, and other services to enable aged persons to live independently and safely are clearly consonant with the foregoing policies and goals, even though the efforts may be focused on the needs of the middle class elderly. And where a religious organization undertakes even a small part of a task that has been declared a responsibility of government, there is no reason to presume

the legislature would be niggardly in exempting those aspects of the operation not designed to generate income or profit from payment of the general excise tax, a tax levied on the privilege of doing 'business.' " (Footnote omitted.) *In re Central Union Church,* 63 Hawaii, 199, 204–205, 624 P.2d 1346 (1981).

"For centuries, and in nearly every civilized Country, the care of the aged has been considered charitable. Moreover, the social need of governmental and charitable caring for the aged, as well as the importance and necessity for such a benevolent public policy, have become widely recognized and accepted, as medical science in the United States constantly lengthens life expectancy with its resulting increase in the number of needy aged. The elderly, even those who are not completely incapacitated physically, suffer from loneliness, and from mental and physical infirmities which tend to increase as they grow older and their children leave the family home and their contemporaries move away or die. With each passing year, they usually become less and less able to cope with the day-to-day problems of life, including the management of their homes, their proper maintenance and support, and even, at times, their adequate nourishment; and they often live in fear and dread of illness or of some physical disability or possible poverty, or of just plain inability to adequately take care of themselves. It is certainly in the public interest and public welfare that homes and other facilities be established and maintained to relieve these worries and anxieties, these fears and sufferings, and this well-known inability of the aged to adequately care for themselves. Furthermore, it is a matter of common knowledge that pension plans, retirement benefits, and Government-supported programs for the support and care of the elderly greatly aid, but simply *do not solve all* of the underlying human problems of the aged." (Emphasis in original.) *In re*

*Tax Appeal of United Presbyterian Homes,* 428 Pa. 145, 151, 236 A.2d 776 (1968). For a collection of tax exemption cases, all of which turn on their particular facts, see annot. 37 A.L.R.3d 565.

Finally, our state has a firm public policy recognizing that the elderly have particular needs which should be met. Chapter 303, §§ 17-135a through 17-137f, of the General Statutes creates a department on aging. Among the duties of the commissioner on aging are that she "act as advocate for the need of more comprehensive and coordinated programs for elderly persons and the aged"; General Statutes § 17-136d (6); "assist and advise all appropriate state, federal, local and area planning agencies for elderly persons and the aged in the performance of their functions and duties pursuant to federal law and regulations"; General Statutes § 17-136d (7); "plan services and programs for elderly persons and the aged"; General Statutes § 17-136d (8); and "coordinate outreach activities by public and private agencies serving elderly persons and the aged. . . . " General Statutes § 17-136d (9). These services, activities and programs are not limited to elderly persons who could not otherwise afford to purchase them for themselves. The plaintiff's facility is fully consistent with and serves to implement this important public policy of our state.

I therefore dissent.