The plaintiff commissioner of revenue services (commissioner) has appealed the ruling of the Probate Court for the district of New Canaan, determining that in the will of Dorothy A. Hewlett, a bequest to the New Canaan Inn, Inc., is exempt from succession taxes by virtue of the status of the inn as a charitable organization under General Statutes § 12-347 (a). The plaintiff's reasons for appeal set forth the foregoing facts and add that the inn does not qualify for this exemption since it is not being operated exclusively for charitable purposes as § 12-347 (a) requires and that the Probate Court erred in sustaining the inn's claim for the exemption and in ordering the commissioner to recompute the succession tax due from the Hewlett estate and to issue an amended assessment exempting the bequest to the inn. The plaintiff contends that the inn does not qualify as a charitable organization and that the judgment of the Probate Court was in error.
Dorothy A. Hewlett died on September 27, 1987. In her will, she left the entire residuary estate to seven organizations, one of which was the inn. The commissioner ruled that the portion of the residuary left to the inn was not entitled to exemption under § 12-347 (a) and assessed a tax on it.
The inn is a congregate living facility for elderly people and provides support services for its residents including living quarters, meals, concerts and a wide variety of programs designed to improve and to enhance their lives. It has been in operation for nine *Page 471 
years. The inn has qualified under § 501(C)(3) of the Internal Revenue Code for tax exempt status from federal income tax and under General Statutes § 12-412 (8) for tax exempt status from state sales tax and from local property taxes. The inn is organized as a nonstock corporation. Under article II of its certificate of incorporation, the nature of its activities is described as: "This corporation is a non-profit corporation established to build own and operate housing and related facilities suited to the special needs and living requirements of occupants of housing for the elderly: to conduct research and planning and to take action directed toward the improvement of living and working conditions, housing, recreation and education for the elderly and any and all related activities not in conflict with the provisions of Section 501(C)(3) of the Internal Revenue Code as the same may be amended from time to time."
Thereafter, the certificate states the usual powers and privileges given to all corporations including article V, which states that the corporation is nonprofit, shall not issue stock or pay dividends and that no part of its net earnings or assets shall inure to the benefit of any individual or its officers and directors. Article VI provides that the corporation shall not engage in acts prohibited by General Statutes § 33-281b et seq., governing private foundations and charitable trusts as defined in § 4947(a)(2) of the Internal Revenue Code. The income schedule shows that the inn was built with initial contributions of $650,441 beginning in 1978 and a commercial mortgage and that the contributions from 1978 to 1987 totaled $2,193,536. The mortgage payment of interest and principal on the real property mortgage are met annually entirely from contributions. In 1987, income from residents totaled $611,287 and expenses totaled $667,476, less depreciation of $59,410, so that cash outlay was $608,066. Significantly, in addition to other expenses, mortgage and *Page 472 
interest payments totaling $158,160 were made. These payments were, as previously stated, covered by charitable contributions. It follows, therefore, that excess expenses are covered by charitable contributions. Volunteers perform services of substantial value. The inn anticipates that staff hours with a value of $26,235 annually are performed by volunteers, reducing the cost of each occupant's maintenance. The income of the twenty-nine residents based on the Connecticut median family levels published by the federal Department of Housing and Urban Development (HUD) shows the following categories for the inn: "very low," 45 percent; "low," 24 percent; "moderate," 14 percent; and "other," 17 percent.
The agreement executed between the inn and each resident requires that for admission the applicant must be sixty-five years of age or older, healthy enough to live independently, desire and need the inn's facilities and services, cooperate with the inn's communal living requirement, guarantee the standard charges and obtain a sponsor who will also execute the lease and assist with emergencies and financial concerns. The admissions policy further states that the inn will not accept persons who are chronically disoriented, nonambulatory, unable to manage their affairs or incapable of attending to their personal needs. The applicants must meet the inn's criteria for housekeeping, meals, entry, mobility, health, toilet, social, emotional and psychological conditions, community living, grooming, hygiene, safety, communication, finances, legal affairs and substance abuse. The residence agreement requires the resident to pay a stated monthly amount which may be varied, as the inn determines, for which it provides a room or suite, three meals per day, bed linen and towels and maid service. The lease also provides that the resident will not transfer assets listed in admission documents, will provide one month's security deposit and will pay the fees promptly. *Page 473 
While the inn requires no down payment for the quarters occupied, it does receive monthly payments from each resident that average $15,282.17 annually or $1273.51 monthly. The annual incomes of the residents range from $5016 to $91,200 annually. Of twenty-nine residents, twelve have incomes that are less than the average maintenance costs of each resident.
The pertinent part of General Statutes § 12-347, entitled "Exemptions," of chapter 216, entitled "Succession and Tranfer Taxes," provides: "Exemptions. (a) There shall be exempt from the tax imposed by the chapter all transfers to or for the use of the United States, any state or territory, or any political subdivision thereof, the District of Columbia, any public institution for exclusively public purposes, any corporation or institution located within this state which receives money appropriations made by the general assembly, or any corporation, institution, society, association or trust, incorporated or organized under the laws of this state or of any state whose laws provide a similar exemption of transfers to any similar Connecticut corporation, institution, society, association or trust, formed for charitable, educational, literary, scientific, historical or religious purposes, provided the property transferred is to be used exclusively for one or more of such purposes; but no such transfer shall be exempt if, at the time such transfer occurred, any officer, member, shareholder or employee of such corporation, institution, society, association or trust is receiving or previously received any pecuniary profit from the operation thereof, except reasonable compensation for services in effecting one or more of such purposes or as proper beneficiaries of a strictly charitable purposes or if the organization of any such corporation, institution, society, association or trust for any of the foregoing avowed purposes is a guise or pretense for directly or *Page 474 
indirectly making for it, or for any of its officers, members, shareholders or employees, any other pecuniary profit, or if it is not in good faith organized or conducted for one or more of such purposes; and any transfer to any person, association or corporation in trust for the care of any cemetery lot."
It is the commissioner's claim that the inn does not qualify for an exemption under that section as a charitable institution and that its property is not used exclusively for charitable purposes.
The purposes for which a corporation is organized are to be found in its certificate of incorporation. Whether the property for which exemption is claimed is actually and exclusively used for these purposes must be determined from the facts of the case. Camp IsabellaFreedman of Connecticut, Inc. v. Canaan, 147 Conn. 510,514, 162 A.2d 700 (1960). "The definition of charitable uses and purposes has expanded with the advancement of civilization and the daily increasing needs of men. . . . It no longer is restricted to mere relief of the destitute or the giving of alms but comprehends activities, not in themselves self-supporting, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and more likely that they will become useful citizens. . . . Charity embraces anything that tends to promote the well-doing and the well-being of social man. . . . An institution is charitable when its property and funds are devoted to such purposes as would support the creation of a valid charitable trust." (Citations omitted.) Id., 514-15. "A charitable trust is one which performs some governmental function, such as fostering education, relief of poverty, care of the sick or aged, burial of the dead, or performs some other public task which relieves the governmental burden of the state. Because charitable *Page 475 
trusts perform such governmental duties, they are accorded state recognition and protection, and receive the benefit of state and federal tax exemptions as well as numerous other special statutory privileges." Lockwood
v. Killian, 172 Conn. 496, 512, 375 A.2d 996
(1977). "`A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to estabdish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government.' `The enforcement of charitable uses cannot be limited to any narrow and stated formula. As has been well said, it must expand with the advancement of civilization and the daily increasing needs of men. New discoveries in science, new fields and opportunities for human action, the differing condition, character and wants of communities and nations, change and enlarge the scope of charity, and where new necessities are created new charitable uses must be established. The underlying principle is the same; its application is as varying as the wants of humanity.'" Mitchell v. Reeves, 123 Conn. 549,554, 196 A. 785 (1938).
The inn was built with contributions from individuals and institutions plus a $900,000 commercial mortgage. None of the residents was or is required to contribute to the building fund, which distinguishes the inn from other such congregate living arrangements. The residents are required to make monthly payments which average $1273.53 for the room or suite occupied by them. These payments provide social support services that take care of the needs of elderly people, the average age of the inn residents being 82.7 years. The facility provides recreation, support and health services, *Page 476 
housing and related facilities suited to the special needs and living requirements of the elderly occupants, three meals per day, bed linen and towels and maid service. Residents furnish their own rooms with the inn providing carpeting, draperies and a refrigerator. The residence agreement states that, if the resident is unable to meet the standard fee and any other charges beyond his control, "it is the Inn's policy to take whatever steps may be required to maintain such a person in residence. Once admitted, no resident who has fulfilled all the other elements of this Agreement shall be asked to leave the Inn for inability to pay beyond his/her control; provided he/she has fully cooperated with the Inn."
In addition to the annual operating expenses of $15,201 per resident, which are met by the payments of $15,282 per resident, there are direct expenses totaling $158,160 or $3954 in additional annual costs per resident. These additional expenses are met annually by contributions from institutions and individuals. A rating of the residents' annual incomes using 1987 HUD estimates of median family income levels places 45 percent in the very low category, 24 percent in the low category, 14 percent in the moderate category and 17 percent in the high moderate category.
The report of the House of Representatives' subcommittee on housing and consumer interests of the select committee on aging recommends congregate living. The congregate housing services program of the federal government indicates that congregate living provides a service-enriched environment as an alternative to institutionalization, that it prevents premature institutionalization, that it is cost effective in delivery of service to the elderly and to the handicapped and that it has substantial positive effects on the life satisfaction of its participants. Another report furnished to the court indicates that "seven out of ten elderly living alone spend *Page 477 
down their income to the federal poverty level after 13 weeks in a nursing home. Within one year over 90 per cent of single elderly are impoverished." The report of the congregate housing study committee dated April, 1985, shows conclusively that state provided and subsidized congregate living saves Medicaid $10,200 per resident toward the cost of each nursing home bed and that 3400 to 5000 new nursing home beds will be required in the next six years unless there is a major commitment to developing community alternatives. The report further indicates that a large percentage of cases approved by the state for nursing home placement could have been returned to the community if adequate noninstitutional services had been available.
A report entitled "Growing Older in Connecticut" dated January, 1988, points out "not only . . . the physical needs of frail elderly tenants and the lack of services to meet those needs" but also discusses the problems of isolation. These problems are worse when physical impairment is involved. These tenants are more likely to be cut off from the social contact and the informal support offered by other tenants in the project. The report goes on to demonstrate that congregate living programs are recommended to take care of those problems. "In addition to the benefits of enabling the elderly to live as independently as possible, providing adequate care can prevent unnecessary nursing home admissions." While one cannot assume that all elderly in congregate housing would otherwise be placed in a nursing home, it is still important to note that the per day cost in Medicaid dollars of providing nursing home care is, on the average, two to three and one-half times greater than the average daily cost to the state's department of housing for congregate living. In February, 1989, the average age of the residents of the inn was 86.7 years. *Page 478 
It is commonly recognized that the life span of our population is increasing. "`"Since the enactment of the Statute of Charitable Uses during the reign of Elizabeth, aid to the aged and infirm has been recognized as charitable." . . .'" United Church of Christ
v. West Hartford, 9 Conn. App. 448, 461, 519 A.2d 1217
(1987), aff'd, 206 Conn. 711, 539 A.2d 523 (1988). The evidence discloses that while the inn is taking care of its residents for a substantial monthly fee, it requires no substantial initial payment for admission as was the situation in United Church of Christ v. West Hartford,
supra ($73,000); or as in Covenant Home, Inc. v. Boardof Tax Review, 14 Conn. App. 441, 541 A.2d 130, cert. denied, 208 Conn. 815, 546 A.2d 282 (1988) ($52,000). The monthly payments provide housing, meals, and a group of social services geared to the needs of elderly people. In addition, the inn has an established policy that, once a resident is admitted, if he is unable to meet the standard fee and any other charges that are beyond his control, then the inn will take such steps as are necessary to maintain that person in residence. The inn, by its services, fulfills the needs and social purposes of its residents.
"`Approaching those years when the physical and mental faculties normally decline over an indefinite period of time and being faced with the prospect of expending increased but indeterminable amounts for care during that period, the applicants, by means of such life care contracts, avoid the need of living in penury occasioned by the haunting fear that they will exhaust their meagre resources and become public charges.' Fredericka Home for the Aged v. San Diego,35 Cal.2d 789, 794-95, 221 P.2d 68 (1950).
"`The elderly have been recognized as a disadvantaged and distressed group with definite needs calling for special attention. Poverty is "only one form of distress *Page 479 
to which the elderly as a class are particularly susceptible." Rev. Rul. 79-19, 1979-1 C.B. 195, 196. Both Congress and the state legislature have acknowledged a duty and responsibility to enable aged persons to lead more secure and independent lives. See the Older Americans Act of 1965, Pub.L. No. 89-73 § 101,79 Stat. 219; HRS Chapter 349, S.L.H. 1976, c. 217. Among the entitlements of the elderly delineated in the Older Americans Act and HRS Chapter 349 are "[s]uitable housing, independently selected, designed and located with reference to special needs and available at costs which older citizens can afford . . . [and] [r]etirement in health, honor, and dignity."
"`Private efforts to provide food, shelter, health care, and other services to enable aged persons to live independently and safely are clearly consonant with the foregoing policies and goals, even though the efforts may be focused on the needs of the middle class elderly. And where a religious organization undertakes even a small part of a task that has been declared a responsibility of government, there is no reason to presume the legislature would be niggardly in exempting those aspects of the operation not designed to generate income or profit from payment of the general excise tax, a tax levied on the privilege of doing "business." ' (Footnote omitted.) In re Central Union Church,63 Haw. 199, 204-205, 624 P.2d 1346 (1981).
"`For centuries, and in nearly every civilized Country, the care of the aged has been considered charitable. Moreover, the social need of governmental and charitable caring for the aged, as well as the importance and necessity for such a benevolent public policy, have become widely recognized and accepted, as medical science in the United States constantly lengthens life expectancy with its resulting increase in the number of needy aged. The elderly, even those who are not *Page 480 
completely incapacitated physically, suffer from loneliness, and from mental and physical infirmities which tend to increase as they grow older and their children leave the family home and their contemporaries move away or die. With each passing year, they usually become less and less able to cope with the day-to-day problems of life, including the management of their homes, their proper maintenance and support, and even, at times, their adequate nourishment; and they often live in fear and dread of illness or of some physical disability or possible poverty, or of just plain inability to adequately take care of themselves. It is certainly in the public interest and public welfare that homes and other facilities be established and maintained to relieve these worries and anxieties, these fears and sufferings, and this well-known inability of the aged to adequately care for themselves. Furthermore, it is a matter of common knowledge that pension plans, retirement benefits, and Government-supported programs for the support and care of the elderly greatly aid, but simply do not solve all of the underlying human problems of the aged.' (Emphasis in original.) In re TaxAppeal of United Presbyterian Homes, 428 Pa. 145, 151,236 A.2d 776 (1968). For a collection of tax exemption cases, all of which turn on their particular facts, see annot. 37 A.L.R.3d 565.
"Finally, our state has a firm public policy recognizing that the elderly have particular needs which should be met. Chapter 303, §§ 17-135a through 17-137f, of the General Statutes creates a department on aging. Among the duties of the commissioner on aging are that she `act as advocate for the need of more comprehensive and coordinated programs for elderly persons and the aged'; General Statutes § 17-136d (6); `assist and advise all appropriate state, federal, local and area planning agencies for elderly persons and the aged in *Page 481 
the performance of their functions and duties pursuant to federal law and regulations'; General Statutes § 17-136d (7); `plan services and programs for elderly persons and the aged'; General Statutes § 17-136d (8); and `coordinate outreach activities by public and private agencies serving elderly persons and the aged. . . .' General Statutes § 17-136d (9). These services, activities and programs are not limited to elderly persons who could not otherwise afford to purchase them for themselves." United Church of Christ v. WestHartford, supra, 462-64 (Borden, J., dissenting).
"`"`It is a settled rule of law that statutes which exempt from taxation are to be strictly construed against the party claiming an exemption.'" . . . "Exemptions no matter how meritorious, are of grace, and must be strictly construed. They embrace only what is strictly within their terms." . . . "Exemption from taxation is the equivalent of an appropriation of public funds, because the burden of the tax is lifted from the back of the potential taxpayer who is exempted and shifted to the backs of others. . . ." ' `It is also well settled that the burden of proving entitlement to a claimed tax exemption rests upon the party claiming the exemption. . . .' " (Citations omitted.) UnitedChurch of Christ v. West Hartford, 206 Conn. 711,718-19, 539 A.2d 523 (1988). " `It is the actual use being made of the property on the tax day which is determinative, not the use intended for the future. . . .' " (Citations omitted.) Id., 720. United Church of Christ
v. West Hartford, supra, 206 Conn. 720, established two requirements for tax exemption for a charitable organization: (1) the corporation must be so operated that it relies on charitable donations for a portion of its maintenance and therefore is not self-supporting; and (2) its operation lessens the likelihood that its residents would become burdens on society. The commissioner concedes that the inn is organized for charitable purposes and *Page 482 
its certificate of incorporation so indicates. In addition, the operations of the inn meet the criteria stated inLockwood v. Killian, supra, for a charitable trust, the equivalent of a charitable organization. It remains for the inn, therefore, to demonstrate its entitlement to the claimed exemption from succession taxes. The inn receives a substantial part of its budget from the annual rentals paid by the residents in the amount of $611,287. In 1987, however, it received approximately $158,160 or one-fifth of its monetary requirements from donations, resulting in $3874 of the annual cost of maintaining each resident being donated. While the inn assesses a monthly maintenance charge for each resident in the average amount of $1273.73, it assesses no fee for admission as was the case in United Church of Christ
v. West Hartford, supra, 206 Conn. 711, and in CovenantHome, Inc. v. Board of Tax Review, supra.
By not requiring a substantial down payment for admission, the inn preserves the assets of each resident, which then are able to produce income for the resident. Initial charges of $73,000 in the UnitedChurch of Christ case and $52,000 in the CovenantHome, Inc., case at the current rate of interest of 8.5 percent paid by banks would provide a resident with $5900 and $4420 annually or approximately $492 and $318 monthly with which to meet the monthly charges of the inn. While the residents of the inn pay substantially more monthly than do the residents in the UnitedChurch of Christ and Covenant Home, Inc., cases, those payments do not support its annual budget, which requires charitable contributions from outside sources. Some of the residents' annual incomes are as low as $5016, which makes them unable to meet the annual cost of their maintenance. It follows then that the inn's more affluent residents pay monthly amounts that help to maintain the many residents unable to pay the average *Page 483 
monthly charge. In addition, the volunteer hours contributed by many individuals do have some impact on the cost of maintenance of the residents. The court concludes that the inn is not self-supporting and meets the first requirement of operating exclusively for charitable purposes.
The data presented to the court show that seven out of ten elderly persons living in nursing homes spend down their incomes to the federal poverty level within thirteen weeks and that within one year over 90 percent of the single elderly are impoverished. The residents of the inn pay a monthly amount scaled to their incomes and abilities to pay and so there is no risk that they will become impoverished. In addition, the stated written policy of the inn is that once a resident is accepted, the inn will take whatever steps are necessary to maintain in residence, a resident who is unable to meet the fees. As the dissenting opinion in UnitedChurch of Christ v. West Hartford, supra, 9 Conn. App. 464(Borden, J.), stated, it is the state's policy to recognize and to meet the needs of the elderly, which the inn is doing completely. It follows that the inn is performing a governmental function without cost to the state and that there is certainly no danger that its residents will become burdens on society or on the state. Of significance to this court is the fact that the inn has been granted exempt status as a charitable institution by the federal government under § 501(C)(3) of the Internal Revenue Code, by the state for sales tax charges under § 12-412 (8), and by the town of New Canaan for real and personal property taxes. The inn is providing all the physical and social needs of the elderly and, in addition, is furnishing the residents with the elements set forth in chapter 303, §§ 17-135a
through 17-137f.
 The court finds the New Canaan Inn, Inc., to be a charitable corporation exempt from the succession tax under §